FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 MAR 24  PM 2: 44

U.S. DISTRICT COURT
N.D. OF ALABAMA

DEE ANDREA ASHURST,               )
                                  )
            Plaintiff,            )
                                  )
v.                                ) CIVIL ACTION NO. 96-PWG-2622-S
                                  )
THE UNIVERSITY OF ALABAMA,        )
                                  )
            Defendant.            )

**ENTERED**

MAR 2 4 2000

<u>MEMORANDUM OF DECISION</u>

This matter is before the undersigned magistrate judge pursuant to the provisions of

28 U.S.C. § 636(c) for consideration of defendant's motion for summary judgment made pursuant

to the provisions of Rule 56, *Federal Rules of Civil Procedure* (document #27), the defendant's

motion to strike the plaintiff's declaration (document #36), and defendant's motion for leave to

amend the complaint and pretrial order (document #48). Plaintiff has filed evidentiary submissions

and a brief in opposition to defendant's motion for summary judgment. The matter is deemed

submitted. After consideration of the motions as more fully set forth below, the defendant's motion

for summary judgment (document #27) is GRANTED. Defendant's motion to strike declaration

(document #36) is DENIED. Defendant's motion for leave to amend (document #48) is MOOT.

<u>THE COMPLAINT</u>

Ms. Ashurst contends that her employer, the University of Alabama at Birmingham,

is liable for damages under Title VII and Title IX because of the conduct of one of her co-employees

beginning "in early 1995." Ms. Ashurst claims in count one of her complaint that because of her

sex she was subjected to "differential terms" of employment in violation of Title VII because the

defendant had caused or permitted a hostile work environment. In count two of her complaint Ms.

Ashurst contends that her employer retaliated against her after she made a complaint about her

treatment by disciplining her for misconduct. She alleges in count three of the complaint that she

was denied a promotion because of her complaint of sexual harassment.[1] In count four of her complaint Ms. Ashurst maintains that UAB violated the provisions of Title IX because she was discriminated against on the basis of her sex.  In count five, plaintiff argues that UAB violated Title IX by retaliating against her for her opposition to sexual harassment.  In count six Ms. Ashurst makes an otherwise non-specific claim that the defendants violated her Equal Protection rights and asserts a claim pursuant to 42 U.S.C. § 1983.

FACTUAL BACKGROUND

In January 1993 Dee Andrea Ashurst was hired by UAB as a certified respiratory therapist technician for the UAB medical complex in the Department of Respiratory Services at University Hospital.  In December of 1993 Ms. Ashurst was promoted to the position of Registered Respiratory Therapist. (Complaint, document #1, p.3, ¶ 6).  At the time she was hired Ms. Ashurst received a staff handbook entitled "You and UAB."  (Document #27, Exhibit D-3 bearing Ms. Ashurst's signature acknowledging receipt of the handbook on January 4, 1993).  The handbook at page 69 set out a policy against sexual harassment.

# SEXUAL HARASSMENT POLICY

## May 7, 1990

. . . .

### INTRODUCTION

The University of Alabama at Birmingham is firmly committed to providing an environment that is free of discrimination, including sexual harassment.  Sexual harassment includes unwelcome sexual advances,

---

[1]    Ms. Ashurst does not allege that she was denied a promotion because of her sex but, rather, because of the complaint she registered with the University concerning the co-employee harassment.

request for sexual favors, and other verbal or physical conduct of a sexual nature when (1) submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment or academic evaluation, (2) submission to, or rejection of, such conduct by an individual is used as the basis for employment or academic decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or of creating an intimidating, hostile, or offensive working or educational environment. Such behavior may violate federal law and/or give rise to personal liability for the results of such behavior. Consequently, UAB prohibits all forms of sexual harassment and will investigate complaints thoroughly and with the utmost seriousness.

A violation of this policy shall result in the taking of disciplinary action which may include termination.

## SEXUAL HARASSMENT IN THE WORK PLACE

It is a violation of UAB policy for any employee to engage in sexual harassment in the work place or in work-related situations. Employees who believe they have been harassed by a supervisor, co-worker, or other employee of UAB should report the incident promptly to their supervisor(s) or to the Relations Division of the Office of Human Resources Management. Human Resources Management has the responsibility for coordinating and conducting an investigation of sexual harassment claims in the work place and for recommending corrective action to the University administration.

. . . .

## SEXUAL HARASSMENT – GENERAL

Full and prompt reporting is necessary for effective implementation of this policy and the University encourages such reporting. However, the

3

University's duty to protect employees and students exists when the University's supervisory personnel know, or have reason to know, of unreported sexual harassment. Supervisors therefore are directed to take all appropriate steps to prevent sexual harassment in their areas of responsibility and to take corrective action, including disciplinary action, in response to inappropriate behavior which may constitute sexual harassment even in the absence of a complaint.

This policy seeks to encourage students, staff and faculty to express freely and responsibly through established procedure, complaints of sexual harassment. All such complaints shall be treated as confidential and shall be disclosed only to those who need to know as part of the investigatory or resolution process. Any act of interference, retaliation or coercion by a University employee against a student or employee for using this policy interferes with such free expression and is itself a violation of this policy.

(Exhibit D-1 to Document #27).

Ms. Ashurst was hired by Cindy Arant, the Assistant Director of Respiratory Services. (Document #31, Plaintiff's Evidentiary Submission, Exhibit D, p.1; Exhibit B, Ashurst Deposition, p. 1). Ms. Ashurst was assigned to the night shift.[2] At the time Ms. Ashurst was hired, Regenia Harris was the Director of Respiratory Therapy and the direct supervisor of Ms. Arant. As Assistant Director Ms. Arant made out the monthly work schedule for the employees of the department which set out the days and shifts to be worked by an employee. (Document #31, Exhibit E, Deposition of Susy Burke, p.36). As part of the schedule, Ms. Arant would designate the therapist to serve as the charge therapist for the particular shift.[3] (Document #31, Exhibit D, Arant,

---

[2] Apparently, the respiratory therapy department workday was divided into both twelve-hour and eight hour shifts. Each therapist worked two twelve hour and two eight hour shifts during the pay period. (Document #31, Exhibit C, p.65 of the deposition of Redman).

[3] Sometime later this task was performed by Daisy Sheppard.

4

p.34-35; Exhibit E, Burke at p.63).  The charge therapist did not schedule either the shifts or days

to be worked by a particular therapist but assigned the therapists on a given shift to perform the

specific tasks of the Respiratory Therapy Department at locations within the UAB Hospital system.

(Document #31, Exhibit A, Ashurst affidavit, ¶ 2).  At the time of the occurrences which give rise

to this litigation, the Respiratory Therapy Department performed required respiratory services

throughout the hospital system within the discrete medical units of the hospital which had requested

such therapy including surgery, the emergency room, the heart transplant unit, the bone marrow

transplant unit, the neonatal intensive care unit and other separate medical centers.  For the most

part, an individual RT was not assigned to a particular unit on a permanent basis.  The charge

therapist, after reviewing the schedule of requested work assignments, would dispatch RTs to each

unit requesting respiratory therapy services.  (Document #31, Exhibit C, Redman deposition, p.59-

61; Exhibit D, Arant deposition, p.42).  The charge therapist for the particular shift would arrive for

work earlier than the RT staff to prepare individual assignments to meet the requirements of the

work load for the night.  (Document #31, Exhibit D, p.42).  Each of the several charge therapists was

paid an additional $1.00 per hour for the shifts he or she served as charge therapist.  (*Id.* at p.42; also

Exhibit F, deposition of Tamara Sisson, p.5-6).  Merely because an RT was designated as a charge

therapist did not mean that that staff member had charge therapist responsibility at all times.  When

not "in charge" the designated therapist was simply another RT.  (Document #31, Sisson, Exhibit

F, p.10-12; also Exhibit D, Arant at p.34-35; Exhibit G, deposition of Susy Burke at p. 34-35).  The

decision as to which RT trained as a charge therapist would serve as the charge therapist for the

particular shift was made by Cindy Arant when she made out the monthly work schedule.

(Document #31, Exhibit E, Burke, at pp.36-37; Exhibit F, Sisson, pp. 10-12).  A charge therapist

may have the charge responsibility two, three or four days of the work week depending upon the

5

schedule. (*Id*.) Even when acting as the charge therapist the RT performed the same duties as other staff members while carrying the charge therapist beeper. (*Id*. at p.9). The charge therapist could not hire, fire, promote or demote another RT. The charge therapist had no disciplinary authority over the RT staff. (Document #31, Exhibit E, Burke, at p.34). The charge therapist could report an incident to supervisors including disputes between RTs and nurses, or patients and other acts of misconduct in the same manner as any employee. (Document #31, Exhibit E, Burke, at p.44-45).

       The administrative functions of the department were in Jefferson Towers, a separate building. The RTs would report to Jefferson Towers to clock in, then walk to the pavilion where assignments were handed out from a room referred to as the break room. The break room in the pavilion had some of the equipment and medications used by the RTs. (Document #31, Exhibit C, Redman, pp.65-68). The room, although designated as a break room, also served as a "staging area" for the RTs as well as a facility for scheduled breaks. (Document #31, Exhibit B, Ashurst, pp.181-184). When not on a specific assignment an RT would often be in the break room. (Document #31, Exhibit A, Ashurst affidavit, ¶ 2 at unnumbered p.2). An RT in need of equipment, supplies or medications would often obtain them from a storage cabinet in the break room. (*Id*. at ¶ 3). Charge sheets which were prepared for the purpose of billing patients for respiratory therapy services were completed in the break room and returned there to the supervisor. (Exhibit C, Redman, p.90-91).

       A typical night shift would have from four to eight RTs.[4] (Document #31, Exhibit D, Arant, p.34; Exhibit C, Redman at p.127). In 1995 and 1996 both male and female RTs worked out of the pavilion break room. In addition to Ms. Ashurst, female employees of the Respiratory Therapy Department included Charge Therapists Susy Burke, Tamara Dozier Sisson, and Rebecca

---

[4]     The term RT is used here to indicate certified respiratory therapists, respiratory therapists and respiratory technicians.

Dye and RTs  Jennifer Collier, Tammy Martin, Tamara Adkinson, and Deborah Lovoie.  Male employees included Phillip Richards, David Smith and a man whose sense of humor and social maturity reached their full development at early adolescence, Donald Lee Redman.[5]

After serving in the United States Army where he received health services training, Redman became a certified respiratory therapist.  He was hired by UAB in August of 1992. (Document #31, Exhibit C, Redman deposition, p.72).  He received an employee handbook but did not recall reading the University's sexual harassment policy.  (*Id.* at p.72).  Redman attended a sexual harassment class and received a document which also described the policy.  (*Id.* at p.73). Redman "glanced" at this document.  (*Id.*).  Redman also received anti-sexual harassment training in the Army.  (*Id.* at p. 76).  Redman attended orientation for new employees at which Human Resources Officer Anita Bonasera spoke on the topic of the sexual harassment policy.  (*Id.* at p. 78;83).  Redman understood from the orientation that sexual harassment ... "involved more than coercion..." and included "offensive behavior."  (*Id.* at p. 81-82).  Redman's respiratory therapy supervisor was Cindy Arant.  Redman was assigned to the night shift working out of the pavilion break room until November of 1995 when he was transferred to the Regional Neonatal Intensive Care Unit. (Document #31, Exhibit C, Redman at p.100).

As noted, the break room in the pavilion contained lockers for equipment, uniforms and personal items.  The room had two large conference tables and a small bulletin board.  The room was available for RTs not on assignment to read, talk and complete paper work.  It was not uncommon for RTs to post cartoons or other items on their lockers.  During the period of time relevant to this lawsuit, Susy Burke, Rebecca Dye and Tamara Sisson were charge therapists on the

_____

[5]     While satisfied the description of Mr. Redman is accurate no credit is claimed for its origination.  See C.J. Posner's assessment of a similar cretin in *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431 (7th Cir. 1995).

night shift. Daisy Sheppard, also a charge therapist with more than twenty years of service, maintained a separate office from which she performed some administrative duties and provided the RT services for the emergency room.

MS. ASHURST'S ALLEGATIONS

While Ms. Ashurst was a student, prior to her employment by UAB in 1993, she met a woman named Donna Johnson at the Caraway Hospital. (Document #31, Exhibit B, Ashurst at pp.0031-0035). Ms. Johnson and Redman had an intimate personal relationship. When Ms. Ashurst was employed by UAB, Ms. Johnson worked in Respiratory Therapy on the day shift. Redman and Johnson had difficulties in their personal relationships which led Ms. Johnson to tell her co-employees that Redman had hit her, that he was a stalker and that he "... could not get an erection." (Document #31, Exhibit B, Ashurst at pp.0033-0035; Exhibit C, Redman at pp. 138-140). At some point Redman confronted Johnson about her allegations during the day shift. (Document #31, Exhibit B, Ashurst at pp.0043-0045; Exhibit C, Redman at pp. 139-141). Redman then began to talk about Johnson's allegations to the RTs on the night shift to "... tell them [his] side of the story." (Exhibit 3, Redman at pp. 140-41). According to Redman the topic then became a "big joke." (*Id.* at p. 41). Ms. Ashurst alleges that Redman would enter the break room saying such things as "I'm impotent," "I'm a woman beater," "I can't get it up," and "I'm a stalker." ( Ashurst at pp.0046). Ms. Ashurst found Redman's comments to be "totally obnoxious." She did not think it appropriate to make fun of beating someone or "harassing" them at work. (Document #27, Exhibit A to defendant's evidentiary submission; Ashurst deposition at pp. 0048). While it is not clear from the record when these incidents took place, Ms. Ashurst maintains that after the "stalker" and "impotent" comments, in early 1995 Redman began to make lewd and offensive sexually charged comments to and among both male and female co-employees.

8

CLIPPINGS, DRAWINGS AND POSTINGS

At one point an article concerning male impotence was taped on the door of Redman's locker. (Document #31, Exhibit C, Redman at pp. 138). Although Redman denies that he had posted the article he believed that, in light of Johnson's comments, the article too was a "big joke." *(Id.* See also p.142). Redman's locker also displayed at some point a headline edited from the UAB Reporter which read "Peters to be Honored." (Document #31, Exhibit 3, Redman at pp.143, 145-146).[6] Also posted on Redman's locker were cartoons and other material, though not necessarily all of these postings were inherently sexually oriented or vulgar.[7] Ms. Ashurst also observed at one point a drawing on a break room table which had been altered to show an enlarged penis extending from the crotch area of a male figure to the mouth. The drawing bore the legend "Don's fantasy." Ms. Ashurst testified that a day shift employee, Ms. Lou Altman, brought a pad called a "working girl's doodle pad" to the break room. On the pad was an outline of a male figure without genitalia. Ms. Ashurst saw Jennifer Collier and Don Redman with the pad, apparently amused. Neither Collins nor Redman attempted to display the pad to Ms. Ashurst. Before she left the break room Ms. Ashurst looked at the pad and saw the modified drawing and the legend. Ms. Ashurst said that Jennifer Collier told her that Redman had drawn the picture. (Document #31, Exhibit B, Ashurst at pp.0121-0125).[8] There is no evidence that overtly lewd, suggestive or

---

[6]   The headline actually referred to an honor to be received by a UAB faculty member. *(Id.* at 147).

[7]   In her brief in opposition to defendant's motion for summary judgment at p. 5, Ms. Ashurst also refers to an article about premature ejaculation and a headline "Twice the Average Size" citing her deposition, Exhibit #2. This exhibit is a summary of a meeting on July 6, 1995 between Ms. Ashurst and Senior Personnel Relations Representative Anita Bonasera. The excerpted portions of the depositions of Ashurst, Redman and Susy Burke do not mention these items. It assumed, however, that during the relevant period Mr. Redman displayed these clippings on his locker.

[8]   Redman denies that he drew the penis. He testified in his deposition that he drew boxer shorts with a heart pattern on the figure. He admitted seeing a drawing such as Ashurst described but maintained that it did not have "Don's fantasy" or even his name on it. (Document #31, Exhibit B, Redman at p.117-124). For the

pornographic material, photographs or drawings such as the drawing on the "working girl's doodle pad" were posted on Redman's locker nor elsewhere in the break room.

## INCIDENTS DIRECTLY INVOLVING REDMAN AND MS. ASHURST

Ms. Ashurst complains that she was subjected to "sex-based treatment by ... Don Redman ... [beginning in early 1995]." (Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment at p.3). She notes that Redman engaged in frequent lewd and offensive conversations with other staff members, both male and female. She identifies, however, only four specific instances in which the offensive conduct directly involved her.

At some point near the end of the football season or during the 1995 basketball season, Ms. Ashurst brought a stuffed elephant toy to the break room. Redman asked to see it. When he took the elephant he made a "masturbating-type movement his hands on the trunk." (Document #31, Exhibit B, Ashurst at pp.0135). In April 1995 one of the employees brought a bag of lollipops to the break room. Ms. Ashurst asked for one but was told that the lollipops were gone. Ms. Ashurst testified that Redman spoke up and said "you can blow my pop." (Document #31, Exhibit 3; Ashurst, Exhibit 2, Report of Bonasera; Deposition, Exhibit C, Ashurst at pp. 0069-0070). Ms. Ashurst told Redman that "... it was sick" and said "no thanks." (Ashurst at p. 0069). In May of 1995 Tamara Dozier and Ms. Ashurst were in the break room. Redman, wearing hospital scrub pants, entered the room, placed both of his hands on his crotch and made a "jerking sexual motion." (Document #31, Exhibit B, Ashurst at pp.0087). Ms. Ashurst was disgusted and appalled by the incident although Ms. Dozier merely laughed. (*Id*. at p. 0090). Ms. Ashurst did not say anything

---

purposes of this order it is presumed that Redman or Collier drew the offensive picture in the manner described by Ms. Ashurst.

to Redman but left the room. (*Id.*).[9] In May or June Redman entered the NICU conference room where the RTs clock in and out. In the presence of Ms. Ashurst, Tamara Atchison and Debra Lovoie he laid on his back with his legs spread and knees up saying "come and get it girls." (Document #31, Exhibit B, Ashurst at pp.0127-0129). According to Ms. Ashurst, Atchison and Lovoie were "amused."

SEXUALLY ORIENTED CONVERSATION

In addition to the discrete acts described above, Redman frequently initiated or participated in vulgar or sexually oriented conversations. (Document #31, Exhibit B, Ashurst at pp.0080, 0082). For example, Redman once asked female employees if they urinated in the shower. (Ashurst at p.137). He discussed the size of the breasts of female waitresses and dancers at an exotic bar. (*Id.*). He made "lots of references to the large size of his penis." (*Id.*) He made a vulgar sexual comment in describing an item of food. (*Id.* at 0138). Tamara Sisson once heard Redman ask Jennifer Collier what brand of personal sanitary product she preferred. Redman made a crude comment regarding the method of use of a particular product. (Exhibit B, Ashurst, attachment B, July 6, 1996 complaint).[10] On another occasion, Susy Burke and Redman completed a "sex quiz" from a magazine in the presence of others, including Ms. Ashurst, in which they talked about sexual preferences. (Ashurst at 0066). They asked each other questions concerning frequency of sexual conduct. During this conversation, Burke and Redman also discussed genitalia of hospital patients. (*Id.*) Ms. Ashurst testified in her deposition that sex topics were regularly discussed by Burke, Redman and "numerous other people on the night shift." (Document #31, Exhibit B, Ashurst at

---

[9]    Ms. Ashurst stated in her deposition that she left the room to telephone Daisy Sheppard, a Charge Therapist.

[10]    The excerpted portions of Ms. Ashurst's deposition submitted by the plaintiff do not reflect that she actually heard this conversation. Sisson testified that she frequently talked with Ms. Ashurst and the topics included Redman and Collier. (Exhibit F, Sisson deposition, p.18, 33-36).

11

pp.0067). Ms. Ashurst observed that Jennifer Collier and David Smith participated in and "found amusing" these discussions. (*Id.* at 0067-0068). Ms. Ashurst also heard Jennifer Collier discussing in crude terms an alleged sexual liaison between Susy Burke and Don Redman. On another occasion, Collier openly commented that she would not perform a particular sexual act even if her husband asked. (Ashurst at pp. 0080-81). Redman was not present when Collier made this comment nor apparently when Collier discussed the possible sexual relationship between Burke and Redman. (Ashurst at p. 0080). Ms. Ashurst felt that she was "sexually harassed" by Redman, Susy Burke, Jennifer Collier and David Smith. (Ashurst at p.0092-0093). Ms. Ashurst testified that Phillip Richards, another male RT, did not engage in the sexual conversations. (Ashurst at 0068). She did feel that "the whole staff participated in ... this sexual behavior except for a very few people, ... [such as Tammy Martin, Phillip Richards and some individuals in different parts of the hospital]." (Ashurst at 0096).

MS. ASHURST'S COMPLAINTS

      In April 1995, after Redman's "blow my pop" remark, Ms. Ashurst went to Daisy Sheppard to complain about the "sexually explicit things coming out of [Redman's] mouth." (Document #31, Exhibit B, Ashurst at pp.0075-79). Ms. Ashurst told Sheppard that she was "totally disgusted with the type of behavior of the [co-employees] ... primarily Don Redman's behavior." (Ashurst at p. 0077). Ms. Ashurst most probably talked to Sheppard in the basement office where Sheppard also served as the emergency room respiratory therapist. (Document #31, Exhibit G, Sheppard's deposition at p.6).[1] Ms. Ashurst recalled that Ms. Sheppard did not say much during

---

[1]    Ms. Sheppard did not recall ever hearing of a complaint from Ashurst concerning the conduct of Redman until after Ms. Ashurst complained to Cindy Arant in June. (Exhibit G, p.25).

    Q:     Okay, prior to Susie mentioning that to you had Dee ever discussed with you Mr. Redman's conduct?
    A:     No.
    Q:     Had she ever maybe not called it sexual harassment or hostile or whatever, but had she complained

12

the meeting. (Ashurst at 0084). Ms. Ashurst testified that after the crotch grabbing incident in May she telephoned Sheppard and told her that "[she] was really disgusted and appalled by this and [that] ... something needed to be done about it." (Ashurst at 0087). Ms. Ashurst said in her deposition that she thought Sheppard had said that she would talk to Redman. (*Id*. at 0088).

On June 30, 1995 Ms. Ashurst and Susy Burke had what appears to be a chance meeting on the crosswalk between Jefferson Towers and the Spain Wallace Center. (Document #31, Exhibit B, Ashurst at p.56). Sometime prior to that meeting Ms. Burke had been told by Laura Arendall, a relatively new RT, that Ms. Ashurst had complained that her assignments were unfair and that Burke had shown favoritism to Redman. (Document #31, Exhibit G, Burke, p.81).[12] During the conversation, Ms. Burke told Ashurst that she (Burke) was concerned about her "professional reputation." Ms. Ashurst told Ms. Burke that "if she was [ ] concerned about her professional reputation, then she wouldn't be having conversations with [Redman] in the break room that are involving sexually explicit topics." (Exhibit B, Ashurst, p.0059). Ms. Ashurst testified that at that point

> ... she [Burke] put her hands on her hips and she said
> "are you making a sexual harassment complaint" and
> I said "yes. You need to make a note of it and do

---

or mentioned to you that the way he was acting bothered her?
A:      No.
Q:      Never before?
A:      Never before.
For the purposes of this order, Ms. Ashurst's recollection is considered as true.

[12]     Whether or not Ms. Arendall told Burke Ms. Ashurst's complaint is not material. Both Burke and Ashurst confirm that the work assignments and the alleged relationship between Redman and Burke were discussed during the cross walk meeting. Ms. Ashurst denied to Burke that she had said anything about Burke and Redman. Ms. Ashurst did confirm that she had complained about the assignments.

> what you are – what your responsibilities tell you that
> you need to do with the complaint."

(Exhibit B, 0059).

Ms. Burke told Ms. Ashurst that she was "going down to Cindy Arant's office in the morning and wanted [Ashurst] to go with her." (*Id.*) Ms. Ashurst told Burke that she would indeed go to Arant's office but not with Burke. That same night Ms. Burke, after reading the sexual harassment policy, called her shift charge therapist, Rebecca Dye, who told her "follow the policy." (Document #31, Exhibit E, Burke, p. 91). Burke then told Redman that Ms. Ashurst was upset about things he had said. Burke told Redman that Ms. Ashurst had been shocked by his language. She talked to other staff members to tell them that Ms. Ashurst had been offended and that the employees should "watch what [they] say." (Burke, p. 89-91). Burke testified that she spoke with the night shift with the intent ".. to stop behavior, any behavior at that moment." (*Id.,* p.91). She then telephoned Ms. Ashurst to tell her that she had informed the staff that Ms. Ashurst found their behavior offensive and that they should "watch what they say." (*Id.,* p. 95).

Ms. Ashurst spoke with Cindy Arant "a couple of days later." Arant referred Ms. Ashurst to Anita Bonasera. Ms. Ashurst and Bonasera met "for hours" on July 6, 1995. (Document #31, Exhibit B, Ashurst at pp.0101, 0110). Ms. Ashurst told Bonasera that "there was a problem with the group of people [she] was working with." (Document #31, Exhibit B, Ashurst at pp.0104). Ms. Bonasera obtained from Ms. Ashurst a completed handwritten form entitled "Confidential Sexual Harassment Complaint Form." (Document #27, Exhibit B Bonasera, p.34-35; Exhibit A, Ashurst, Attachment #1). Ms. Bonasera later prepared a typed summary of Ms. Ashurst's complaints. (Document #27, Exhibit B, Bonasera, p.35; Exhibit A, Ashurst deposition, Attachment

2).[13] The typed summary included references to Redman's general proclivity for twisting everything into "something sexual."  The summary recounted the conduct described above.  The summary stated that four months earlier Ms. Ashurst had told Redman that his comments were not appropriate but that he continued to behave inappropriately and "seemed to get pleasure out of intimidating her." (Document #27, Exhibit A, Ashurst, Attachment 2, p.2).  Ms. Bonasera noted that Ms. Ashurst had gone "... to Daisy Sheppard informally to express her concern regarding [Redman's] behavior. Then, on June 30, 1995 Suzy Burke stopped her on the cross walk [and] it was then that [Ms. Ashurst] advised Suzy that she considered Don's behavior to be sexual harassment." (*Id.*)  After reading Ms. Bonasera's summary of the complaints Ms. Ashurst signed it on July 19.  (Document #27, Exhibit A, Ashurst, p.0114-0115).[14]

Ms. Bonasera began an investigation which included interviews with several of the employees of the respiratory therapy night shift.  Disciplinary recommendations were made to the University Vice-President by Connie Pruitt based upon the information obtained by Bonasera. (Document #27, Exhibit B, Bonasera, p.79).  Redman received a letter of reprimand from Regenia

---

[13]     Ms. Ashurst testified that she met with Ms. Bonasera only once after the initial July 6 meeting.  (Document #27, Exhibit A, Ashurst at p.0116-0117).  Ms. Bonasera testified that she talked to Ms. Ashurst "in person three, four or five times [including] on an occasion when she was so tired after completing her shift we didn't complete our conversation." (Bonasera, p.35).

[14]     The last paragraph of the summary read "Your signature indicates this document is an accurate account of your interview with Anita Bonasera concerning your complaint against Don Redman." *Id.*

Harris dated August 21, 1995.[15/] The letter read as follows:

> TO:        Don Redman
> FROM:      Regenia Harris
> SUBJECT:   Inappropriate Behavior in the Work Place
>
> As you are aware, a sexual harassment complaint has been brought
> against you by another UAB employee. The employee alleges you
> made inappropriate remarks and participated in other behavior of a
> sexual nature in the work place. Several of the allegations were
> substantiated by other employees.
>
> The report [sic] behavior that you displayed in the work place is
> clearly a violation of the federal guidelines regarding sexual
> harassment and UAB policy as stated on pages 69 and 70 of the "You
> and UAB" Handbook for Administrative, Professional and Support
> Personnel.
>
> You attended a sexual harassment training class on August 20, 1993
> and you were made aware of the behavior that may constitute sexual
> harassment in the work place and the consequences that could result;
> therefore, there is no excuse for such behavior to have occurred.
>
> Your behavior was inappropriate and must cease immediately. The
> University is firmly committed to providing an environment that is
> free of sexual harassment. Failure on your part to adhere to this
> written warning by repeated incidents of this nature will result in
> your immediate termination from the University of Alabama at
> Birmingham.
>
> I acknowledge that I have read and received a copy of the above-
> memorandum on the date indicated on the signature line.

(Document #27, Exhibit E,).

Susy Burke also received a letter of reprimand dated August 21, 1995 from Harris.

---

[15/]   Mr. Redman refused to acknowledge receipt of the memorandum. (Bonasera, p.75; Document #27, Exhibit E).

The letter read:

TO:             Susy Burke
FROM:           Regenia Harris
SUBJECT:        Inappropriate Conversation in the Work Place

As you are aware, a sexual harassment complaint was filed by an
employee under your supervision against a co-worker. Due to your
own admission during the investigation, you indicated that you were
aware that inappropriate conversions and joking took place in the
work area.

In your supervisory capacity, it is your responsibility to ensure the
work place is free of inappropriate conversations and behavior that
may be interpreted as sexual harassment. Your knowledge of the
inappropriate behavior and failure to take immediate action to end
such conduct serves to condone the behavior.

You attended a sexual harassment training class on August 18, 1993;
therefore, you were made aware that it is the supervisor's
responsibility to prevent sexual harassment in the work place. As
you were advised, the employer is liable if the employer knew or
should have known of the conduct which created a hostile
environment and failed to take adequate action immediately.

You must take your supervisory responsibilities seriously. Your
participation in any inappropriate behavior or failure on your part to
report any inappropriate remarks or other behavior, whether verbal
or non-verbal, which create an offense or hostile work environment
will result in further disciplinary action up to and including
termination.

(Exhibit E, p.3).

During the investigative process Ms. Ashurst's co-workers complained to Bonasera

that Ms. Ashurst had herself used offensive and profane language in the work place. As a result of

this report, Ms. Ashurst also received a letter from Regenia Harris.  The letter read:

> TO:           Dee Andrea Ashurst
> FROM:         Regenia Harris
> SUBJECT:      Inappropriate Conversation in the Work Place
>
> The purpose of this memorandum is to caution you about using profanity and engaging in inappropriate conversations in the work place.  Such behavior presents an unprofessional image for the department.
>
> Several of your co-workers reported that you have used profanity in the work place and initiated conversations about your department and co-workers that were offensive.  Spreading false information about your co-workers and supervisors to individuals outside of the department and questioning your assignments without foundation is inappropriate.
>
> As stated in the "You and UAB" Handbook, the University prohibits the use of profanity in the work place and it is a violation of UAB policy that generally requires discipline and result in discharge.
>
> In the future, you must refrain from using profanity or engaging in inappropriate conversations in the work place.  If you have questions about your assignments or need to discuss circumstances regarding your employment, you should communicate with your supervisor or manager directly.  Failure to comply with this written counseling will result in further disciplinary action up to and including termination.
>
> . . .

(Exhibit E, p.2)

Like Mr. Redman, Ms. Ashurst refused to acknowledge receipt of the memorandum.

Also, as a result of the investigation Regenia Harris sent a memorandum to all Respiratory Services employees stating that:[16]

> The purpose of this memorandum is to remind you to refrain from using profanity, making inappropriate remarks or engaging in other unacceptable behavior in the work place.

---

[16]     In addition, the material posted on lockers was removed.

Inappropriate remarks or other behavior, whether verbal or non-verbal, could be interpreted as sexual harassment. Such behavior is a violation of federal guidelines regarding sexual harassment and UAB policy as stated on pages 69 and 70 of the "You and UAB" Handbook for Administrative, Professional and Support Personnel.

Sexual harassment is defined as being "unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such comment by an individual is used as the basis for employment decisions affecting such individuals, or (3) such conduct has the purpose or effect of unreasonable [sic] interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Most of you were advised of the sexual harassment guidelines and UAB's policy prohibiting such behavior in a sexual harassment training class offered to the Department in 1993. Therefore, there is no excuse for such behavior to occur in the work place. You need to be cautioned that the University will not tolerate such behavior. Any employee engaging in behavior of a sexual nature in the work place whether verbal or non-verbal, will be subject to severe disciplinary action up to and including termination.

If you have questions or need more clarification regarding sexual harassment, please inform me.

(Exhibit E, p.4).

## RETALIATION

Ms. Ashurst contends that her employer retaliated against her because of her complaint of sexual harassment both because she received the August 21, 1995 cautionary memorandum from Regenia Harris concerning her language in the work place and because she was

denied a promotion to the position of charge therapist in October of 1995.[17] Ms. Ashurst also alludes to a "shunning" of her by other individuals on the night shift as a form of institutional retaliation.

In the administrative scheme of the Respiratory Therapy Department, the position of charge therapist was not a position or job classification but, rather, an assignment of additional duties to those of an RT. (Document #27, Exhibit H, Arant deposition, pp.44, 48). In September of 1995, Cindy Arant learned that several RTs who had served as charge therapist would be leaving or otherwise unavailable for the year 1996. (*Id*. p.43). Unlike a job posting for a "official supervisor" which would require a job number and an advertisement the need of the Department for additional charge therapist was announced by a notice posted on the bulletin board in the RTs's break room. (*Id*., p.49; Document #27, Ashurst deposition, Exhibit A, Exhibit 3). On September 20, 1995, Ms. Ashurst acknowledged the posting for charge therapist in a letter to Ms. Arant. Ms. Ashurst stated in the letter that she was qualified for the position and requested Arant to telephone her. (Document #27, Exhibit A, Attachment 3).

Although there were no formal training programs or educational requirements a charge therapist would receive an "orientation" from a senior charge therapist, frequently Daisy Sheppard, to become familiar with the responsibilities of the assignment. The orientation included developing an ability to use the computer to make work assignments. The charge therapist was expected to be proficient in the different respiratory therapies and performed for all of the discrete medical services. In September or early October of 1995 Tamara Dozier and David Smith began the orientation process. (Document #31, Exhibit D, Arant, p.70). Approximately, in September

---

[17] Ms. Ashurst does not deny that she used a particularly vulgar sexual term in the work place. (Document #27, Exhibit A, Ashurst, p.0096). Ms. Ashurst complains only that until her allegations of sexual harassment "no one had complained ... [ ] ... about me using profanity in the work place." (*Id*. at 0161-0162). Ms. Ashurst also does not dispute that the revelation of her use of vulgar language came to the attention of Anita Bonasera during the investigation of her complaints about others in the work place. *(Id*. 0162-0163).

Cindy Arant telephoned Ms. Ashurst about the orientation process.  On November 2, 1995 Arant

wrote Ms. Ashurst asking her to call to schedule an appointment.  The letter noted that as of that date

the department had "not filled the quota of charge therapist we would like to have trained."

(Document #27, Arant deposition, Attachment).[18]  Ms. Ashurst was scheduled to begin the

orientation with Daisy Sheppard sometime after November 2, 1995.  (Document #31, Exhibit D,

Arant, p.72).  Ms. Arant felt that Ms. Ashurst was not sufficiently skilled in providing homodynamic

monitoring, a respiratory therapy procedure performed in the medical intensive care unit.  As a

charge therapist was called upon to fill the role of backup to all medical units, Ms. Arant felt

proficiency in all such services would be a necessary skill to receive the assignment of charge

therapist.  (Document #31, Exhibit D, Arant, p.52).  Daisy Sheppard worked with Ms. Ashurst

during the orientation process to assist her in learning to use the computer.  Ms. Sheppard found that

"she wasn't up to that.  She couldn't–it would take her too long to get all this stuff in."  (Document

#31, Exhibit G, Sheppard, p.51).  Ms. Sheppard stated that Ms. Ashurst was "doing okay" in the

orientation but that she "didn't finish the process."  (*Id.*, p.50).  Ms. Ashurst tried working with the

computer "only a couple of times.  She never came back to do any more."  (*Id.*, p.51).[19]  During this

---

[18]   The letter acknowledged Ms. Ashurst's September 21 letter.  Ms. Arant wrote that she had left a message on
Ms. Ashurst's answering machine on an earlier occasion asking her to schedule an appointment and had
received no reply.  Ms. Arant also noted that she had spoken personally with Ms. Ashurst on September 27,
1995 asking her to call to schedule an appointment.  Apparently, Arant believed that Ms. Ashurst had not
responded to either of the earlier requests.  (*Id.*)  After defendant's motion for summary judgment was filed
Ms. Ashurst submitted an affidavit denying that she had talked to Arant in September and that she had received
a message.

[19]   A therapist involved in the orientation could come in early on a shift to learn.  These hours worked in this
fashion were paid as over time by UAB.  The RTs generally worked two twelve hour shifts and two eight hour
shifts during the work week.  Many of those in the orientation would come in on the eight hour or short shift
day for a twelve hour shift in order to learn the procedures.  (Document #31, Exhibit F, Arant, p.42-43).

period Ms. Arant received several verbal objections to Ms. Ashurst becoming a charge therapist from her night shift co-workers. (Document #31, Exhibit F, Arant, p.35-36). Ms. Arant requested that such objections be made in writing. (Id.) She testified that she had received "several notices in writing." (Id, p.35).[20] Those who objected to Ms. Ashurst's assignment as a charge therapist "felt like she was going to use that role to get back at everyone." (Id., p.39). Ms. Arant interviewed Ms. Ashurst on November 14, 1995 to discuss the charge therapist assignment. Among other topics they discussed the "tension in the air" between Ms. Ashurst and the night shift. (Id.) While in her EEOC complaint Ms. Ashust states that she "learned on October 6, 1995 that she had not [been selected] for the position of charge therapist"(document #27, Exhibit D-2), there is simply no evidence in the record that anyone told Ms. Ashurst that she had not been selected or considered. There is evidence that David Smith and Tamara Dozier began the orientation for the assignment prior to November 2, 1995. Arant's letter of November 2 clearly reflects that the system had not provided orientation for the number of charge therapist that would be required even though Smith and Dozier had begun the process in October.[21]

Ms. Ashurst alleges that after her complaint to Suzy Burke but before she spoke with Ms. Bonasera the night shift staff ignored her or acted rudely toward her. She described an incident in which she brought a cake to an informal holiday party on July 3. While food from other RTs were sampled no one tried Ms. Ashurst's contribution. (Document #31, Exhibit B, Ashurst, p.0157-

---

[20]   The record does not reflect any written notice or objection. Ms. Arant did not receive written objections from Tamara Dozier or Susy Burke.

[21]   In an affidavit submitted after the defendant's motion for summary judgment Ms. Ashurst denied speaking to Ms. Arant or receiving a call. Ms. Ashurst did not mention in her deposition how she knew she had not been selected. Defendant moved to strike the affidavit. (Document #36). Even if the affidavit is considered there is no evidence that Ms. Ashurst was denied anything. The November 2 letter clearly indicates the positions were open. Ms. Arant then met with Ms. Ashurst. Ms. Sheppard stated that Ms. Ashurst did not complete the orientation. The affidavit is not clearly contradictory. The defendant's motion is DENIED.

0159).  Ms. Ashurst told Ms. Bonasera that after Suzy Burke's announcement of her complaint of

sexual harassment "every one [had] been ignoring her."  (Document #27, Exhibit 2, Attachment to

Bonasera's deposition).

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment the court is to construe the evidence and factual

inferences arising therefrom in the light most favorable to the non-moving party.  *Adickes v. S. H.*

*Kress & Co..*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  Summary judgment

can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  *Federal Rule of Civil*

*Procedure* 56(c).  As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry
> of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the existence
> of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial.
> In such a situation, there can be no genuine issue as to
> any material fact, since a complete failure of proof
> concerning an essential element of the non-moving
> party's case necessarily renders all other facts
> immaterial.

*Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not to "weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 90 L.Ed.2d 202 (1986) (*citations omitted*).

The party seeking summary judgment has the initial burden of informing the court

of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings,

depositions, answers to interrogatories and admissions in the file, together with any affidavits, if

any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2552-53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also Federal Rule of Civil Procedure* 56(e).

In meeting this burden, the non-moving party must do more than simply show that there is a metaphysical doubt as to the material facts. *Matsushita Electric Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is "genuine issue for trial." *Federal Rule of Civil Procedure* 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. 2510-11. While claims of sexual harassment often present fact–intensive issues, motions for summary judgment are appropriate to "police the baseline for hostile environment claims." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1243 (11th Cir. 1999) *(en banc) (citing Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n.8 (5th Cir. 1999)).[21]

---

[21]    "[I]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained." *Mason v. Continental Illinois National Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

TITLE VII–GENERAL PRINCIPLES

Title VII forbids any employer from "discriminat[ing] against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is a form of discrimination within the meaning of Title VII. *See e.g. Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986). Traditionally, courts have found two types of sexual harassment are prohibited by Title VII: *quid pro quo* harassment and the hostile work environment harassment. *See Steele v. Offshore Ship Building, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989). In her brief in opposition to the defendant's motion for summary judgment, Ms. Ashurst correctly notes that the Supreme Court has modified these "labels" in favor of a review of the totality of the circumstances. While this observation is correct the framework of existing law is helpful in assessing the legal nature of a claim and the factual underpinning. Indeed, Ms. Ashurst herself identifies her claims as satisfying both the *quid pro quo* and hostile work environment requirements.

*QUID PRO QUO* CLAIMS

An employer may not require sexual consideration from an employee as a *quid pro quo* for job benefits. *See, e.g., Miller v. Bank of America*, 600 F.2d 211 (9th Cir. 1979); *Garber v. Business Products, Inc.*, 552 F.2d 1032 (4th Cir. 1977) (*per curium*); 29 C.F.R. 1604.11(a)(1981). In order to establish a violation of Title VII on the grounds of sexual harassment of this kind, an

employee must prove a number of elements, many of which are similar to the proof required to establish the existence of a hostile or offensive work environment.[22] A plaintiff must prove that

(1)     the employee belonged to a protected group;

(2)     the employee was subjected to unwanted sexual harassment;

(3)     that the harassment complained of was based upon sex;

(4)     the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment.

The acceptance or rejection of the harassment by an employee must be an expressed or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment.  29 C.F.R. § 1604.11(a)(1) and (2) (1981).  As in the typical disparate treatment case, an employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.  *Quid pro quo* sexual harassment generally involves a supervisor's extortion of sexual favors from an employee by offering or threatening job benefits. *Steele*, 867 F.2d at 1316. "*Quid pro quo* sexual harassment requires proof that the plaintiff's acceptance of the harassment is an express or implied condition to receiving a job benefit or not receiving negative treatment." *Sowers v. Kemira, Inc.*, 701 F. Supp. 809, 823 (S.D. Ga. 1988). Generally, when a supervisor discusses the employee's status at the time of sexual advances, *quid pro quo* harassment exists. *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1390 (M.D. Ala.

---

[22]     On a practical level there are many cases that could be characterized interchangeably as condition of work or *quid pro quo* cases.  *See e.g. Tompkins v. Public Service Electric & Gas Company*, 568 F.2d 1044, 1046 n.1 (3d Cir. 1977).

1997).  A plaintiff need not demonstrate that the employer had actual knowledge of the harassment since the employer is strictly liable for any *quid pro quo* harassment.  *Farley v. American Cast Iron Pipe Company*, 115 F.3d 1548, 1551 (11th Cir. 1997).  An employer may be strictly liable under Title VII for discriminatory practices of the supervisory personnel but may be relieved from such responsibility if conduct is against employer's policy and a prompt remedial action is taken upon notice of discriminatory conduct.  The reason for this rule is readily apparent.  When the employer gave its supervisory personnel authority to fire employees, it also accepted responsibility to remedy any harm caused by the supervisor's unlawful exercise of that authority.  The modern corporate entity consists of individuals who manage it.  Little, if any, progress in eradicating discrimination in employment will be made if the corporate employer is able to hide behind a shield of an individual employee's actions.  It necessarily follows from this premise that an employer is strictly liable for any sexual discrimination by supervisors that causes tangible job detriment.  *Willingham v. Macon Telegraph Publishing Company*, 507 F.2d 1084, 1091 (5th Cir. 1975) (*en banc*).  "Discrimination against women is no less serious than other forms of prohibited employment practices and it is to be accorded the same degree of social concern given to any type of unlawful discrimination."  H.R. Rep. No. 238 92 Congress 1st Sess. 5 (1971), reprinted in 1972 U.S. Cong. & Ad. N. 2137, 2141.  Sexual harassment resulting in tangible job detriment is a form of sex discrimination every bit as deleterious to the remedial purposes of Title VII as any other unlawful employment practice.  An employer is held strictly liable for the actions of its supervisors that amount to sexual discrimination or sexual harassment resulting in a tangible job detriment to a subordinate employee.  *See Miller v. Bank of America*, 600 F.2d at 213; 29 C.F.R. § 1604.11(c)(1981).

## HOSTILE WORK ENVIRONMENT

"Hostile environment sexual harassment occurs when an employer's conduct 'has the purpose or affect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Steele v. Offshore Ship Building, Inc.*, 867 F.2d at 1315(*quoting Vinson*, 477 U.S. at 65, 106 S.Ct. at 2405). Title VII is violated "[w]hen the work place is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)(*quoting Vinson*, 477 U.S. at 65, 67, 106 S.Ct. at 2405). The harassing conduct must create both an objectively hostile or abusive environment – one "that a reasonable person would find hostile or abusive" – and a subjectively hostile or abusive environment – one that "the victim ... subjectively perceive[s] to be abusive." (*Id.* at 21-22, 114 S.Ct. at 370). In *Henson v. City of Dundee*, 682 F.2d 897, 909-910 (11th Cir. 1982) the Eleventh Circuit explained that there is a distinction between an employer's liability in a *quid pro quo* case and an action premised upon a hostile work environment. In the classic *quid pro quo* case an employer is strictly liable for the conduct of supervisors while in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual harassment before the employer may be held liable. The Eleventh Circuit recognized in *Henson* that the underlying rationale for the difference is premised upon a supervisor's apparent or actual authority to extort sexual consideration from an employee. The court observed that a work environment may be rendered equally offensive by a supervisor or co-employees or even strangers in the work place. The capacity of any person to create a hostile or offensive environment is not substantially enhanced or diminished by any degree of authority which the employer has bestowed upon the individual. When a supervisor gratuitously

28

insults an employee it is generally for his own reasons and accomplished through his own means. He thus acts outside the actual or apparent scope of authority he possesses as a supervisor. In such a case his conduct cannot automatically be imputed to the employer any more so than the conduct of any ordinary employee.[23/] However, when the supervisor uses a means furnished to him to accomplish a prohibited purpose, he acts within the scope of his actual or apparent authority to hire, fire, discipline or promote his victim. Because the supervisor is acting at least within the apparent scope of authority entrusted to him by his employer, when he makes employment decisions, his conduct can be fairly imputed to the source of his authority.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S. Ct. at 371, the Court noted that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all circumstances." The Supreme Court has provided a "non-exclusive set of factors to consider in determining whether an environment is hostile." "These factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

In *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) the Supreme Court moved away from a rigid dichotomy between *quid pro quo* and hostile work environment cases to focus upon the agency related principles of vicarious liability. The distinction, however, between allegations of offensive conduct perpetrated by a co-employee and

---

[23/] It is also true that a supervisor with disciplinary authority or similar power may influence a decision to protest or object.

those alleged to have been committed by a supervisor remains important.[24]   According to the

Supreme Court:

> An employer is subject to vicarious liability to a
> victimized employee for an actionable hostile
> environment created by a supervisor with immediate
> (or successively higher) authority over the employee.
> When no tangible employment action is taken, a
> defending employer may raise an affirmative defense
> to liability or damages, subject to proof by
> preponderance of the evidence, see *Federal Rule of
> Civil Procedure* 8(c), the defense comprises to
> necessary elements: (a) that the employer exercised
> reasonable care to prevent and correct promptly any
> sexually harassing behavior, and (b) that the plaintiff
> employee unreasonably failed to take advantage of
> any preventive or corrective opportunities provided
> by the employer or to avoid harm otherwise.... No
> affirmative defense is available, however, when the
> supervisor's harassment culminates in a tangible
> employment action, such as discharge, demotion, or
> undesirable reassignment.

*Faragher,* 524 U.S. at ___, ___, 118 S.Ct. at 2292-93, *citing Ellerth*, 524 U.S. at ____, 118 S.Ct. at

2269.

In short, an employer's liability for a hostile work environment sexual harassment

claim differs depending on who does the harassing.  The harasser can be a supervisor or someone

else whose position in the work place affords authority over the target of such harassment such that

the harasser is aided by the "agency relation" in harassing the other employee. *Ellerth,* 524 U.S. at

---

[24]   "We do not suggest the terms *quid pro quo* and hostile work environment are irrelevant to Title VII litigation.
To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive
conduct in general, the terms are relevant where there is a threshold question of whether a plaintiff can prove
discrimination in violation of Title VII ... for any sexual harassment preceding the employment  decision to
be actionable [ ] the conduct must be severe and pervasive ... {a} hostile work environment claim [ ] requires
a showing of severe or pervasive conduct." *Burlington Industries v. Ellerth*, 524 U.S. at 752; 118 S.Ct. at
2264.

760-63, 118 S.Ct. 2257.[25] In *Faragher* the court noted and declined to disturb the general agreement among the Circuits that negligence of standard governs employer liability for co-worker's harassment. *Id*. at 799-801, 113 S.Ct. at 2275. Every Circuit that has addressed "co-worker harassment in the post-*Faragher* era" has distinguished the standard applicable to co-worker harassment from that governing harassment by a supervisor, applying to former a variation of the negligence of standard that each Circuit has applied pre-*Faragher*.[26] While the reasonableness of an employer's response to sexual harassment is an issue under both standards, plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer's negligence, than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence. Indeed, in *Faragher,* the Supreme Court reasoned that a supervisor's harassment is both more detrimental (or threatens to be) to the terms and conditions of the individual's employment and more difficult to stop or to have stopped than similar behavior by a co-worker. *See Faragher,* 524 U.S. at 803, 118 S.Ct. 2275.

---

[25]   See e.g. *Mikels v. City of Durham*, 183 F.3d 323, 331-32 (4th Cir. 1999) ("The fundamental determinant of this form of vicarious liability is not, therefore, the harasser's formal rank – vis-a-vis – that of the victim in the particular employment hierarchy, ... but whether the particular conduct was aided by the agency relation.") (internal quotations marks omitted).

[26]   See e.g. *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 441 (2d Cir. 1999); *Mikels*, 183 F.3d at 332; *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (Imposing liability if an employer "knew or should have known of the harassment in question and failed to take prompt remedial action" and noting that standard was "not disturbed by *Faragher* or *Burlington*."); *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (Stating "[e]mployer liability for co-worker harassment is based directly on the employer's conduct" and the employer is liable if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."); *Wilson v. Chrysler Corporation*, 172 F.3d 500, 508 (7th Cir. 1999) ("Liability for co-worker harassment requires a showing of negligence ... [so] a plaintiff must show her employer failed to take reasonable steps to discover and remedy the harassment."); *Dhyme v. Meiners Thirft Way, Inc.*, 184 F.3d 983, 987 (8th Cir. 1999) (Noting distinction between types of harassment and stating that "[o]ur court has long recognized that an employer may be directly liable ... if it knew or should have known of the conduct and failed to take proper remedial action."); *Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 955 (9th Cir. 1999) (Employer liable only for what management knew or should have known in a co-worker harassment scenario.); *Wilson v. Tulsa Junior College*, 164 F.3d 534, 541 n.4 (10th Cir. 1998) (Noting distinction between vicarious liability and negligence of standard.).

Moreover, the employer has a greater opportunity to guard against misconduct of supervisors than that of fellow employees, *see id.*, and, inversely, an employee has a greater opportunity to stop harassment by a co-worker in the first instance. *See id.* ("When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor....").

NOTICE

Related to the inquiry into the proper employee classification of the alleged harasser is the question of at what level of supervision does an organization become liable for the conduct of its employees. Notice is a crucial element in establishing employer liability for hostile work environment harassment whether perpetrated either by a co-worker or a supervisor. Under the rule of negligence governing employer liability where a co-worker creates a hostile environment, an employer is liable only if it knew or should have known about the hostile work environment and did not take appropriate action. *See Faragher*, 118 S.Ct. at 2289. The question of whether an employer had actual notice of a hostile work environment can be answered by examining whether a legally appropriate representative was aware of facts – via any channel of communication – indicating the possibility of a hostile environment. Under existing law, agency principles are relevant to whether a particular employee's knowledge of facts concerning harassment are to be imputed to the employer. The Eleventh Circuit Court of Appeals has established as a baseline matter that notice to a corporate officer or "higher management" is imputed to the employer. *Kilgore v. Thompson & Brock* Management*, Inc.*, 93 F.3d 752 (11th Cir. 1996). Most Circuits have held that beyond this baseline, the knowledge of a supervisor who has remedial power to hire, fire and discipline an alleged harasser is imputed to the employer. *See e.g. Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999) ("The key whose knowledge may be imputed to the employer is remedial power....");

32

*Young v. Bayer Corporation*, 123 F.3d 672, 675 (7th Cir. 1997); *Torres v. Pisano*, 116 F.3d 625, 637

(2d Cir. 1997), *cert. denied,* 118 S.Ct. 563 (1997).  In the case of co-worker harassment the burden

of proving notice is allocated to the plaintiff.  *See Wilson v. Tulsa Junior College*, 164 F.3d 534, 541

n.4 (10th Cir. 1998).  In *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1363 (11th Cir. 1999) the

Eleventh Circuit noted that an anti-sexual harassment policy may itself answer the question of when

and employer has notice of the harassment sufficient to obligate it or its agents to take prompt and

appropriate remedial measures.  The first issue considered is whether there was notice.  Then, and

only then, does the analysis shift to whether the response to the notice of sexual harassment was

reasonable.  *Id.*[27/]  In *Coates* the Eleventh Circuit reaffirmed the notion that "an employee must

provide adequate notice that the employer's directives had been breached so that the employer has

the opportunity to correct the problem."  *Id.* at 1365.[28/]  *Faragher* did not alter the controlling law

concerning notice.  An employer has actual notice of a claim of sexual harassment when a manager

with sufficient remedial authority is put on notice of sexual harassment or where supervisors know

---

[27/]  There are two additional important factors that existed in *Coates*.  First, Sundor conceded that Coates had suffered a hostile work environment and therefore the only issues for consideration were notice and the appropriateness of the response to the harassment.  Here, UAB contests the very existence of sexual harassment.  Second, the complaint alleged co-worker harassment rather than inappropriate conduct by a superior.  The Circuit Court examined the nature or content of the notice the company received in determining whether the information provided by the plaintiff to her supervisors would have permitted the supervisors to reasonably conclude that she was complaining of sexual harassment.

[28/]  In a concurring opinion in *Coates*, Judge Barkett postulated that *Faragher* and *Burlington Industries* stand for the proposition that the inaction of a supervisor receiving a complaint of sexual harassment occupies the same legal ground as a supervisor who actually commits acts of sexual harassment.  Judge Barkett's proposed "rule" applies only when a supervisor knows that an employee is the victim of "severe and pervasive" harassment sufficient to alter the conditions of employment and creating an abusive working environment and then elects to do nothing about it.  *(Coates*, 164 F.3d 1367).  It is axiomatic that for a supervisor to be in a position to engage in such overt "inaction" her position must be commensurate with the management level sufficient to remedy the conduct.  Judge Barkett's observation that a post-*Faragher* analysis now means that "it is not necessary that those at the highest executive level receive actual notice before an employer is liable..." is consistent with pre-existing law.  Neither *Thompson* nor any other pre-*Faragher* authority imposed a burden that a plaintiff prove that he had complained to "the highest executive level" only that he had provided notice of sexual harassment to a manager with sufficient remedial authority to permit her to take action.

or should have known of an environment so severe and pervasively hostile that notice is deemed to have been constructively received. "When an employee's ability to perform .. her job is compromised by discriminatory acts .. and the employer knows it, it is the employer that has the ability and therefore the responsibility, to address the problem, whether the harasser is a supervisor, a co-worker, a client or a subordinate." *Id.* (*Citing Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1515 (11th Cir. 1989)).

*Coates* makes clear that in the post-*Faragher-Ellerth* assessment of a hostile work environment claim the two-pronged analysis of *Henson* is controlling. *Coates*, 164 F.3d at 1363 (*citing Henson v. City of Dundee*, 682 F.2d at 903-905). An organization has notice of sexual harassment arising from a hostile and abusive environment when (1) a manager has actually been made aware of such condition or (2) the condition was so severe, pervasive and openly hostile that an organization should have been aware of its existence without anyone actually complaining. When an organization has such notice the focus is directed to whether the organization then "... took adequate remedial steps to abate it." *Id.* In a hostile work environment case, unlike a traditional *quid pro quo* case or a post-*Faragher* supervisor harassment case, there is no "affirmative defense" issue presented. *Faragher* and *Ellerth* provide for the affirmative defense to supervisor harassment which either does not result in an actual employment detriment or sexual harassment by a supervisor which goes unreported. In such a case the organization can prove that it had an effective anti-sexual harassment policy and that the victim unreasonably failed to take advantage of the policy. The lynchpin of the affirmative defense is harassment by a supervisor for which there is otherwise strict Title VII liability. In contrast, neither *Faragher* nor *Ellerth* impose a requirement that an organization prove that in a co-worker hostile work environment case, more than "whether [it] had adequate notice of the environment and, if so, whether it took adequate steps to abate [the

34

harassment]." *Id.* (Emphasis added). "A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the work place." *DeAngelis v. El Paso Municipal Police Officer's Ass'n,* 51 F.3d 591, 593 (5th Cir. 1995). The concept of sexual harassment is designed to protect women from the kind of male attention that can make the work place hellish for women."[29] The statute is not designed to purge the work place of vulgarity. Identifying the line is not easy. One side of the line is sexual assault, other physical contact, whether amorous or hostile, for which there is no express or implied consent; uninvited sexual solicitations; intimidating words or acts; obscene language or gesture or pornographic pictures. On the other side lies vulgar banter, tinged with sexual innuendo of coarse or boorish workers. *C.f. Baskerville v. Culligan International Company,* 50 F.3d at 430.

In order to make out a *prima facie* case of sexual harassment Ms. Ashurst must establish evidence supporting five principle elements.

    (1)    She belongs to a protected group;

    (2)    She was subjected to unwelcome sexual harassment;

    (3)    The harassment was based upon her sex;

    (4)    The harassment was so severe and pervasive that it altered the terms and conditions of her employment; and

    (5)    There are grounds to hold the employer liable either directly or indirectly.

*Snoke v. Staff Leasing, Inc.,* 43 F. Supp. 1317, 1325-26 (M.D. Fla. 1999) *citing Equal Employment Opportunity Commission v. Domino's Pizza,* 909 F. Supp. 1529, 1534 (M.D. Fla. 1995), *affirmed,*

---

[29]    Obviously, Title VII protection also extends to harassment of men by men or women by women or men by women as well.

113 F.3d 1249 (11th Cir. 1997), *cert. denied,* ___ U.S. ___, 118 S.Ct. 687, 139 L.Ed.2d 634 (1998). There is no dispute that Ms. Ashurst is in a protected group. Under the facts presented here, however, UAB contends that Ms. Ashurst was not subjected to "sexual harassment" but, rather, exposed to vulgarity in the work place that when called to the attention of the institution, resulted in prompt remedial action to stop it. Analytically, UAB contends that the "harassment," if any, was not based upon Ms. Ashurst's sex nor sufficiently severe or pervasive to objectively interfere with the conditions of her employment in the sense of Title VII liability and as a consequence, the defendant is neither directly or indirectly liable for damages. The issues are addressed further below.

<u>HARASSMENT BY A SUPERVISOR</u>

Ms. Ashurst has contended in various pleadings that she was sexually harassed by her supervisors, specifically identifying Susy Burke. She has also alluded to permissive conduct on the part of supervisors which condoned the existence of a severe and pervasive climate of sexual harassment. For the purposes of this order it must be made clear that there is no evidence that Susy Burke ever made a sexually oriented comment directed to Ms. Ashurst nor that she solicited sexual favors or engaged in unwanted touching. There is no evidence that Daisy Sheppard ever sexually harassed Ms. Ashurst in any way. There is no evidence that Tamara Sisson ever made a sexually charged remark to or about Ms. Ashurst. There is, moreover, no evidence that the work place itself was inundated with pornographic material, sexually demeaning or suggestive photographs or pictures nor the unwelcome groping of or leering at female employees. There is evidence of a socially permissive atmosphere in which vulgarity, coarseness and crude behavior, offensive to both men and women, festered. An oft-repeated cautionary incantation is essential to a proper legal assessment of otherwise revolting conduct. "Although Title VII's prohibition of sex discrimination

36

clearly includes sexual harassment, Title VII is not a federal 'civility code.'" *Mendoza*, 195 F.3d at 1244 (*citing Oncale v. Sundowner Offshore Service, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1000-02, 140 L.Ed.2d 201 (1998)).[30] Ms. Ashurst's contention that she was harassed by charge therapist Susy Burke is premised entirely upon three assertions. First, Ms. Ashurst argues as a part of her participation in sexually oriented conversations Burke completed the magazine quiz with Redman and at that time spoke of sexually related matters including the genitalia of patients. Second, Ms. Ashurst contends that in general Burke along with others, both male and female, engaged in vulgar conversations with Redman, although she does not contend that Burke ever made an unwelcome sexual advance or made sexually charged or suggestive comments directly to her. Finally, Ms. Ashurst avers that Burke showed favoritism toward Redman in her assignment of RT tasks. The effect of these allegations is discussed below.

MS. ASHURST'S <em>QUID PRO QUO</em> CLAIM

While Ms. Ashurst did not specifically delineate a discrete claim in her initial complaint to be a *quid pro quo* theory of liability she does clearly argue that she has satisfied the evidentiary burden to proceed on such a claim in her brief in opposition to the defendant's motion for summary judgment. (*See* Brief filed between document #31 and #32). As addressed generally above, such a claim has continued vitality despite the intervening holdings in *Faragher* and *Ellerth*. This is so in part because Ms. Ashurst has identified Susy Burke as both a "supervisor" and a "sexual harasser" who took a discriminatory job action against Ms. Ashurst because of her "... refusal to participate in the sexually harassing conduct which permeated her work environment."

---

[30]   "We have never held that work place harassment, even between men and women., is automatically discrimination because of sex merely because the words have a sexual content or connotations." *Oncale*, 118 S.Ct. at 1000-02.

(*Id.* at p.39). Ms. Ashurst contends that Burke assigned Redman to the more favorable RT tasks on a regular basis rather than plaintiff and did not assign plaintiff to the areas of the complex where she preferred to work. (*Id.* at p.41). Ms. Ashurst alleged that Burke would assign her to tasks which called for her to travel from one part of the medical complex to another at night. These assignments would often be blocks apart. (*Id.*) Ms. Ashurst also asserts Burke "... influenced the decision to deny her a promotion to charge therapist in an effort to [ ] retaliate against her for not participating in the hostile environment and [   ] actually reporting the harassment." (*Id.* at p.43). Ms. Ashurst contends that her situation was "strikingly similar" to the factual underpinnings of *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir. 1987). The importance and continued vitality of the *quid pro quo* analysis is found in the strict employer liability for such conduct both before and after *Faragher-Ellerth*. If a supervisor makes sexual demands upon an employee and threatens an adverse employment action in order to induce compliance whether or not that threat is carried out, the employer may be liable unless it is able to provide the affirmative defenses identified in *Faragher*. "Strict liability obtains in a *quid pro quo* context; '[w]hen a supervisor requires sexual favors as *quid pro quo* for job benefits, the supervisor, by definition, acts as the company.'" *Farley v. American Cast Iron Pipe Company*, 115 F.3d 1548, 1551 (11th Cir. 1997) (*quoting Steele v. Offshore Building, Inc.*, 867 F.2d at 1316). There is no authority, however, for concluding that acceptance of a hostile work environment is a sexual favor to which a plaintiff is required to submit by a supervisor giving rise to a *quid pro quo* claim for which an employer is to be held strictly liable. The case relied upon by Ms. Ashurst illustrates the point.

In *Sparks*, plaintiff was employed as a billing clerk at defendant's Duluth, Georgia facility from May 1983 to March 1984. In February 1984 Dennis Long was appointed manager for the Duluth terminal. There were no pilot freight employees superior to Long at the Duluth facility

nor, indeed, in the state of Georgia. Long had unfettered discretion in personnel matters, including the hiring and firing of all employees. Shortly after Long arrived in Duluth he called Sparks into his office to ask if she was married, had a boyfriend or if she could become pregnant. In March, Sparks was promoted to general secretary reporting directly to Long. Long continued to harass Sparks by putting his hands on her, rubbing her shoulders, touching or smelling her hair, and asking her intimate questions about her personal life. Long often made threatening remarks telling Sparks that she had "better be nice to him" because "her fate was in [his] hands" and that "revenge is the name of the game." *Sparks* at 1556.[1/] In May 1984 the Duluth terminal was closed and Long returned to the Atlanta facility where he returned to his executive sales manager position. Sparks was one of the Duluth employees permitted to go to Atlanta where she worked three nights as a billing clerk. When she called in sick on the fourth night she was fired although a male billing clerk who called in sick on the same night was not. Sparks offered evidence in support of her *quid pro quo* claim that (1) Long had threatened to have Sparks fired if she did not accede to his sexual demands; (2) that Long, a senior manager, was a friend and had worked with the person who actually fired Sparks after she arrived in Atlanta; (3) that another female employee who had refused sexual advances from Long had testified that Long influenced others to reprimand her for fictitious problems; (4) that Long and the man who fired Sparks had discussed Sparks prior to her discharge; and (5) that Sparks was fired after only five days at the Atlanta terminal. *Id.* In Sparks two critical elements are present that are absolutely absent here. First, it is beyond dispute that at the time of the sexual harassment of Sparks by Long, Long had the unfettered authority to fire her. Second, it is also beyond dispute that Long attempted to compel Sparks to submit to him sexually by

---

[1/]    The district court also noted at least one remark "too sexually explicit to repeat here." *Id.* Since 1987, given some of the remarks repeated in this opinion, it would appear that such discretion now yields to completeness.

threatening her job and future.  These facts strongly supported the inference that Long, utilizing his

authority, caused Ms. Sparks to be fired because she spurned him.  In short, Long was not merely

Sparks' supervisor, he was her employer and he made demands for sexual favors.  He did not merely

seek her acquiesce in tolerating an allegedly hostile work environment.

It must be repeated that Susy Burke is not alleged to have demanded sexual favors

from Ms. Ashurst.  Such a demand is the *sin qua non* of a *quid pro quo* action.  *Steele*, 867 F.2d at

1315.  Ms. Ashurst has never alleged or offered evidence that Burke demanded that Ms. Ashurst

accept unwanted touching or sexual advances from either Burke or Don Redman in order to avoid

an adverse employment action.  Ms. Ashurst's *quid pro quo* claim also suffers from two additional

fatal deficiencies.  First, Ms. Ashurst contends that Ms. Burke was in a position to influence the

decision to deny her a "promotion" to charge therapist and, also, to give her a negative evaluation

or review.  Ms. Ashurst's conclusory observations notwithstanding, there is simply no evidence that

either occurred.  The only evidence in the record on the question of who may have influenced the

charge therapist orientation comes from Ms. Arant who said that she did not recall who may have

objected to Ms. Ashurst being a charge therapist but that she knew that neither Susy Burke nor

Tamara Dozier submitted a written objection.  (Document #27, Exhibit H, Arant, p. 36).  There is

simply no evidence that Burke did anything to influence the decision.[32/] Ms. Arant cited her own

misgivings concerning Ms. Ashurst's ability to perform certain monitoring processes within the

medical intensive care unit.  Daisy Sheppard observed that Ms. Ashurst simply never came back to

complete the orientation.  There is no evidence that Ms. Burke influenced the decision in any

---

[32/]    This analysis does not suggest that the charge therapist orientation  result referred to by Ms. Ashurst was in fact an adverse employment action.  This question is addressed more fully below.

fashion.[34/]  Likewise, there is no evidence of any kind that Ms. Burke or, indeed, anyone ever

prepared a negative evaluation or review of Ms. Ashurst's performance any time.  Whether Ms.

Burke had such an ability to influence a review or evaluation of Ms. Ashurst is irrelevant if she

never used such authority for an improper purpose nor threatened to use her authority in order to

obtain Ms. Ashurst's compliance.  There is no evidence or even an allegation that she did either.

Second, Ms. Ashurst complains that Burke assigned her to tasks in different locations within the

complex while permitting Redman to perform more desirable jobs.  Ms. Ashurst offers no evidence

that she received assignments less favorable than any other RT, male or female, with the exception

of Redman.  If Ms. Burke favored Redman, a man with whom she was allegedly having an affair,

such favoritism is not sex discrimination as a matter of law.  *Womack v. Runyon*, 147 F.3d 1298,

1299 (11th Cir. 1998) (*quoting* EEOC Policy Guidance for Employer Liability Under VII for Sexual

Favoritism, EEOC Notice Number 915-048 (January 12, 1990).  "Title VII does not  prohibit ...

preferential treatment based upon consensual, romantic relationships.  An isolated instance of

favoritism toward a 'paramour' ... may be unfair, but it does not discriminate against women or men

in violation of Title VII, since both are disadvantaged for reasons other than their genders."); *see*

*also DeCinto v. Westchester County Medical Center*, 807 F.2d 304 (2d Cir. 1986), *cert. denied,* 484

U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987) (Male respiratory therapist complained that a hospital

administrator had unfairly structured a job position so as to justify hiring his girlfriend.  No Title VII

violation was found.); *Huffman v. City of Prairie Village, Kansas*, 980 F. Supp. 1192, 1199 (D. Kan.

1997).  Ms. Ashurst also contends that she was denied the opportunity to work in the NICU.  She

---

[34/]      Of course, Burke <u>could</u> have influenced the decision as any one could have influenced the decision.  There is
evidence that some of Ms. Ashurt's colleagues, not Dozier or Burke, did submit written objections.  There is
no evidence that Burke did influence the decision.

41

does not, however, offer evidence, nor even allege that this task was offered or denied to her in order to induce her to accede to sexual demands. Ms. Ashurst's had complained to other RTs concerning Burke's assignments before her complaint to either Burke or Arant about sexual harassment. The actual confrontation between Burke and Ashurst was premised at least in part upon her objections to those assignments. There is simply no evidence that a job action, if indeed there was an adverse job action, was intended to punish Ms. Ashurst for failing to submit to Burke or for reporting her complaint to Burke and later Arant and Bonasera.

Ms. Ashurst has presented no evidence which would warrant a finding of a *quid pro quo* claim. She therefore bears the burden of demonstrating the existence of a hostile work environment about which UAB had notice and failed to take reasonable steps to abate the harassment.

## MS. ASHURST'S HOSTILE WORK ENVIRONMENT CLAIM

In order to adequately cabin the inquiry, it bears repeating that to prevail upon a hostile work environment claim Ms. Ashurst must establish that (1) she is the member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; and (4) the harassment affected a term, condition, or privilege of employment. *See Hinson v. City of Dundee*, 682 F.2d at 903. Additionally, in order to hold her employer liable on a Title VII hostile work environment claim Ms. Ashurst must either establish that: (1) the harasser was her employer or one of its agents or (2) that the employer knew or should have known of the harassment caused by a co-worker, but failed to take corrective action. *Sparks v. Freight Carriers*, 830 F.2d 1554, *supra*. It is undisputed that Ms. Ashurst is a member of a protected class. The remaining elements are considered below including employer liability on either a direct or indirect theory. *See Steele*, 837 F.2d at 1315.

42

SEXUAL HARASSMENT

While it may seem only a mere academic exercise to tarry to consider this element, the omni-directional nature of Redman's disgusting conduct and the coeducational makeup of the participants warrant a brief review. Obviously sexual harassment occurs in the work place when an employee is subjected to unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature. 29 C.F.R. § 1604.11. It is apparent that in general everyday profanity, vulgarity or coarseness do not constitute sexual harassment unless that conduct was intended to threaten, demean or denigrate the importance of a woman or women in the workplace. For the purposes of this order it is material that Ms. Ashurst alleges that the participants in the general vulgarity of the work environment included both males, the developmentally stunted Redman and David Smith as well as females, including Jennifer Collier, Debra Lavoie and Susy Burke. Whether particular conduct rises to the level of sexual harassment of sufficient severity to warrant a finding that the conduct affected a term or condition of employment is separate and distinct from considering whether that conduct was "sexual harassment." Here, Redman's masturbatory gesture with Ms. Ashurst's toy elephant, his "blow my pop" comment, his grabbing of his crotch and his lying on the table saying "come and get it girls" was both sexual and harassment within the general definitions of Title VII. There is, moreover, no evidence that Ms. Ashurst ever directly or indirectly encouraged Redman to engage in such conduct. The conduct was at times "obviously sexual in nature [and for the most part] ... sex-specific." *Mendoza*, 195 F.3d at 1253.

BECAUSE OF HER SEX – *ONCALE*

In its reply to plaintiff's brief in opposition to the defendant's motion for summary judgment, UAB argues that Ms. Ashurst was not singled out for disparate treatment because of her

43

sex. Indeed, Ms. Ashurst acknowledges that much of the conduct of which she complains was "offensive" to male employees as well. In *Oncale v. Sundowner Offshore Services, Inc.*, ___ U.S. ___, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) the court noted in quoting Judge Ginsburg's concurring opinion in *Harris* that "the critical issue Title VII's text indicates is whether members of one sex are exposed to disadvantageous terms and conditions of employment to which members of the other sex are not exposed. In short, Ms. Ashurst must take "[w]hatever evidentiary route [she] chooses to follow must ... prove the conduct at issue was not merely tinged with offensive connotation but actually 'constituted discrimina[tion] ... because of ... sex.'" In many cases a woman in the work place may be subjected to non-sexually explicit conduct which is nonetheless intended to demean her in particular or women in general. In such a case the non-sexual nature of the conduct does not diminish the venality of the intent. In Ms. Ashurst's case she alleges that sexually related topics of discussion often interfered with her use of the break room and as a consequence affected the conditions of her employment. These conversations, however, were not necessarily directed to Ms. Ashurst in particular and in many cases, involved both male and female participants. At least two offensive comments were made by Jennifer Collins when Redman not present. A careful review of the evidence does not support the conclusion that this behavior was directed either at Ms. Ashurst nor was it more disproportionately offensive or demeaning to one sex than the other. *Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991)(*citing Henson*, 682 F.2d at 904). Don Redman's conduct, on the other hand, could be reasonably held to be both "disproportionately more offensive to women" as a group and was at least in part "directed to Ms. Ashurst." Sexual behavior aimed at women will raise the inference that the harassment is based on her sex. *Robinson*, 760 F. Supp. at 1522 (*citing Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904-05 (11th Cir. 1988)). Ms. Ashurst has presented sufficient evidence which would permit

a jury to conclude that Ms. Ashurst was singled out by Redman for harassment because of her sex. She has not, however, offered evidence that any other person sexually harassed her in general or demeaned women in the work place.

## SEVERE AND PERVASIVE SEXUAL HARASSMENT

Ms. Ashurst contends that her co-employees created a work environment that was both subjectively and objectively offensive, such that a reasonable person would find the conditions hostile and abusive. *Harris v. Forklift Systems*, 510 U.S. at 23, 114 S.Ct. at 371. In order to determine whether an environment is sufficiently hostile or abusive courts are directed to look at all of the circumstances including "the frequency of the discriminatory conduct, it's severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance." *Id*. Applying these standards will filter out complaints which merely allege "the ordinary tribulations of the work place such as the sporadic use of abusive language, gender-related jokes and occasional teasing." B. Lindemann and D. Kadue, Sexual Harassment and Employment Law, 175 (1992).

## SUBJECTIVELY HOSTILE

Ms. Ashurst testified that she was disgusted by the acts of Don Redman and offended by the contributions of her co-workers, both male and female, to the general climate within the work place. She also testified that because she felt depressed about the situation at work, she began to see a psychologist in the summer of 1995. (Document #31, Exhibit B, Ashurst Deposition, 0145-0147).[35] Allegations that Ms. Ashurst may have used foul or offensive language in the work place

---

[35]   Ms. Ashurst also testified that she had other concerns including her family during the same period but the evidence clearly supports the inference that she saw a psychologist at least in part as a direct result of her work environment.

do not affect her proof of cognizable subjective hostility. Ms. Ashurst's language may influence a fact-finder's assessment of her evidence but an issue of fact of this type does not diminish her proffer. Moreover, even if such conduct were found to have been committed, such language is, without more, not a barrier to Title VII recovery. *See e.g. Swenteck v. U.S. Air, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987). Ms. Ashurst has offered sufficient evidence to permit a reasonable fact finder to conclude that her working environment was subjectively hostile.

OBJECTIVELY HOSTILE

The objective component of the Title VII analysis is "somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. The court, however, as noted above, must "... establish a baseline of actionable conduct...." *Mendoza* at 1249. This assessment is guided by the factors outlined by the Supreme Court in *Harris*. Ms. Ashurst complains of sexual harassment that began "in early 1995" and ended, but for her allegations of retaliation, on June 30, 1995. She described the atmosphere as one in which Redman engaged in frequent conversations involving sex with both male and female employees. Other employees including Philip Richards, a male employee, objected to the vulgar and profane language used by Redman. (Plaintiff's brief at p.9). While recognizing that there is inherent difficulty in relying upon a plaintiff's assertion that particular a conduct was "constant" or "frequent" the court concludes that a reasonable fact-finder might find that the conduct described by Ms. Ashurst was frequent at least within the six month period at issue. See, however, *Mendoza*, 195 F.3d at 1248 ("To the extent that Mendoza's testimony about 'constant' following and staring establishes the frequency fact, this evidence does not create a jury issue on Mendoza's sexual-harassment claim.")

Whether the particular sexual harassment is sufficiently severe so as to create a hostile work environment requires a review of the conduct alleged in context of the work place. In

46

*Mendoza* the Eleventh Circuit canvassed authority from other Circuits to find examples of where an appropriate baseline may be established. In many, if not all of the cases cited in which a pervasive and severe sexually hostile environment was deemed to be absent, the conduct directed specifically to the plaintiff was more severe than that directed to Ms. Ashurst. In *Mendoza* the *en banc* Circuit Court found that a plaintiff does not establish sexual harassment by a supervisor when he "looked [the plaintiff] up and down stop[ping] at her groin area and made a sniffing motion" on at least three occasions. *Mendoza*, 195 F.3d 1242.[36/]

The Circuit Court also observed that a plaintiff who proved that over a two year period she was subjected to several instances of unwanted touching, told that "[her] elbows were the same color as [her] nipples," that she had "big thighs" and endured a male employee attempting to look down her dress on several occasions, could not make out a hostile work environment claim in the Fifth Circuit. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999). A plaintiff who was told that she had the "sleekest ass" in the office by a man who intentionally touched her breasts with papers could not maintain a Title VII claim in the Sixth Circuit.

Without repeating the sordid or vulgar facts of each cited case it is clear that the conduct described which involved unwelcome touching, requests for sex and other vulgar, explicit comments fell short of the proof necessary to establish severe sexual harassment. In *Mendoza* the Circuit Court also contrasted Ms. Mendoza's allegations with "... true instances of sexual harassment." *Id.* at 1262, *citing Dees v. Johnson Controls World Service, Inc.,* 168 F.3d 417, 422 n.12 (11th Cir. 1999); and *Splunge v. Shoney's Inc.*, 97 F.3d 488, 490 (11th Cir. 1996). It would appear that the Title VII baseline is substantially above the facts alleged by *Mendoza* and below the

---

[36/]    The same supervisor who constantly stared at Ms. Mendoza also gave her a big smile when he rubbed up against her hip while touching her shoulder.

47

those alleged in *Splunge* and *Dees*.  Ms. Ashurst was exposed on at least four separate occasions to instances of sexually related conduct by Redman including his "blow my pop" comment.  None of these childish and vulgar comments, however, equal the directly personal sexual intent displayed by Ms. Mendoza's supervisor, although each comment was overtly more explicit.  These acts do not begin to reach the abuse suffered by the plaintiffs in *Splunge* or *Dees*.  The conversations of Redman and others, while coarse if not obscene, were neither directed to Ms. Ashurst nor overtly demeaning in general to women in the workplace.  The court finds that Ms. Ashurst, however personally offensive the conduct to which she was exposed may have been, cannot establish that the sexual harassment was severe as a matter of law.

Separate and distinct from the severity inquiry is a determination of whether as a matter of law the conduct described was threatening or humiliating.  It would appear without dispute that Ms. Ashurst has offered no evidence that the conditions to which she was exposed were threatening.  While she may have been offended and rightfully so, it does not appear that she was the object of humiliation.  This is particularly true when consideration is given to the alleged participation by the female respiratory therapists.  Ms. Ashurst observes that sexual topics were discussed by both sexes with no apparent effort to include Ms. Ashurst in the conversation.  She was subjected to vulgar banter, tinged with sexual innuendo engaged in by coarse and crude co-workers of both sexes.  She was present during at least four uncommonly vulgar episodes involving Redman.  However disgusting these events may have been to Ms. Ashurst, they do not present an issue of severe or pervasive sexual harassment under current Title VII jurisprudence.  The Supreme Court has "made clear that conduct must be extreme to amount to a change in the terms and conditions of employment."  *Faragher*, 118 S.Ct. at 2284.  The conduct described here, while revolting, simply cannot be characterized as extreme.

48

NOTICE AND RESPONSE

If it is assumed that Ms. Ashurst has established a *prima facie* showing of a severe and pervasive sexually hostile work environment she nonetheless may not sustain a Title VII cause of action without first showing that UAB had notice of a hostile work environment and failed to take reasonable steps to abate the condition. *Kilgore*, 93 F.2d at 753. "The employer's notice of harassment is of paramount importance; if the employer had notice (which is required for direct liability but not required for vicarious liability) then it is liable unless it took prompt, corrective action." *Dees v. Johnson Controls World Services, Inc.*, 168 F.3d 417, 422 (11th Cir. 1999). "The employee can show that the employer had knowledge of the harassment by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises." *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d at 904. For reasons more fully discussed above Ms. Ashurst cannot make this showing. In order to sustain her cause of action she must demonstrate actual knowledge on the part of the University.

As a threshold matter it is clear from the undisputed record that until Ms. Ashurst talked to Cindy Arant on or about July 3, 1995, no UAB employee with remedial authority was actually aware of Ms. Ashurst's concerns. Ms. Ashurst contends that UAB was on notice of her allegations because (1) Susy Burke was a participant in her "harassment;" (2) Tamara Sisson knew that Redman had a "foul mouth" and had complained to Cindy Arant at some point in the past; and (3) Ms. Ashurst had complained to Daisy Sheppard about her work environment. While Sheppard and Burke obviously dispute the factual underpinnings for Ms. Ashurst's claims even if she complained to these women, UAB did not have actual notice of sexual harassment. First, as UAB contends and Ms. Ashurst does not dispute, the charge therapist is not a position which appears on the organizational chart for the hospital supervisory staff. Second, the charge therapist has no

49

authority to discipline or counsel an employee for misconduct including sexual harassment.[36] Third, the charge therapist served in that role only upon specific designation for a particular shift. That is, Suzy Burke may be "in charge" on one day and under the direction of Tamara Sisson or someone else the next. A charge therapist is neither a supervisor in the Title VII sense, nor a manager in the disciplinary sense that he or she has the requisite remedial authority to correct a hostile environment by an employee. The charge therapist has no greater nor lesser responsibility to stop or even report sexual harassment than that conferred upon any employee.[37] Despite her seniority as a respiratory therapist Daisy Sheppard was neither a manager of the respiratory therapist unit or a supervisor of its operations. She was a senior therapist who served as the primary RT for the ICU and was involved in the orientation of new charge therapists. Cindy Arant was the first person within the UAB structure both practically and administratively positioned to initiate a remedy.[38]

Ms. Ashurst also contends that because on some unspecified earlier date Tamara Sisson had complained to Ms. Arant about Redman's foul mouth, Arant was on notice of the sexual harassment of Ms. Ashurst. In *Coates v. Sundor Brands, Inc.*, 164 F.3d at 1363, the Eleventh Circuit observed that the law requires that an organization have "... adequate notice of the harassment ..."

---

[36]   Sheppard testified that she would "write up" an employee if she felt it was necessary. It is not clear what Sheppard meant. It is assumed for this order in the light most favorable to Ms. Ashurst that Sheppard may have had the authority to report complaints in writing to Arant. There is no evidence that Sheppard could discipline anyone.

[37]   The UAB sexual harassment policy discussed more fully below imposes upon all employees an obligation to report sexual harassment.

[38]   If it is assumed that the UAB sexual harassment policy imposed an affirmative duty on Sisson, Sheppard or Burke to report "sexual harassment" to Arant or Bonasera, Ms. Ashurst cannot satisfy the adequacy of the notice requirement of *Coates*. Ms. Ashurst told Sheppard nothing that would put her on notice of a need to report "sexual harassment." Even Ms. Ashurst recognized that she only believed that Sheppard would "talk to" Redman about his behavior. Clearly, neither Sisson nor Burke considered the general vulgar banter of the work place to be sexual harassment. Once Ms. Ashurst made a specific allegation, Burke, Arant and Bonasera took action.

50

before liability is imposed. Here, Ms. Sisson said nothing to Ms. Arant about sexual harassment. She said nothing to Ms. Arant about Ms. Ashurst. She told Cindy Arant that Redman had a foul mouth and that something should be done to curtail his conduct. Ms. Arant and UAB cannot be faulted for failing to divine from her comments that there was a hostile work environment claim embedded within these observations.[40/] It was only on June 30, 1995 that Ms. Ashurst told Suzy Burke that she was "making a sexual harassment charge." Although Ms. Sheppard denies ever talking to Ms. Ashurst, the plaintiff does not aver that she told Sheppard that she was being sexually harassed by Redman. She did express her disgust at his vulgarity, but concedes that she never mentioned "sexual harassment."[41/] Ms. Ashurst never complained of "sexual harassment" until she spoke to Burke on June 30, 1995. Burke asked Ashurst at that point to go with her to meet with Cindy Arant that morning. Ms. Ashurst declined but did talk to Arant a couple of days later. Arant immediately referred Ms. Ashurst to Bonasera.

The second prong of the notice analysis is whether an organization took prompt and remedial action. There is no dispute that Ms. Bonasera immediately began an investigation into Ms. Ashurst's complaints. She interviewed co-employees who confirmed aspects of Ms. Ashurst's allegations. As set out more fully above, letters of reprimand were sent to Redman, Burke and Ms. Ashurst. Ms. Ashurst complains that after the investigation Redman was "rewarded" with a transfer to a more favorable assignment. Whether Redman was reassigned does not affect the assessment

---

[40/]   Indeed the report of Ms. Coates to supervisors in *Coates v. Sundor Brands* appears substantially more direct and informative than the information provided to Arant by Sisson or even the information provided to Sheppard by Ashurst.

[41/]   Ms. Ashurst attempts to bootstrap her notice complaint by contending that the report of vulgarity should have been understood to be a complaint of a hostile work environment. First, Ms. Ashurst's complained about virtually all her co-employees, male and female, to Daisy Sheppard. Second, she never said she was threatened, touched, proposition, humiliated or indicated any other indication of sexual harassment. She did complain about crude and vulgar language which offended her as well as others.

of the University's response to the complaint. The touchstone for the evaluation of an employer's response under *Meritor* is reasonableness. An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligations by taking appropriate, remedial or preventative action. *See Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. Certainly, the stoppage of harassment by the disciplined perpetrator is evidence of effectiveness. *See Hirschfeld v. New Mexico Corrections Department*, 916 F.2d 572, 578 (10th Cir. 1990), *citing Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989); *Swentek*, 830 F.2d at 558-59. While Title VII may not require an employer to demonstrate that it has halted all sexual harassment of a particular plaintiff in order to demonstrate that it has been reasonable in its response it would seem self-evident that in the event a plaintiff makes no additional allegations of harassment after the organization initiates its investigation process or made findings that the response is reasonable as a matter of law. Ms. Ashurst contends that in his deposition, Redman professed to have not understood what he had done wrong nor why he was disciplined. Ms. Ashurst implies that before an employer's response may be deemed reasonable it must in effect "make a better person" of a misanthrope such as Redman. The appropriate result for Title VII purposes is controlling Redman's work place behavior, not reforming his social shortcomings. Factors important in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harasser, written warnings, reprimands in personnel files or termination and whether or not the measures corrected the harassment.

SEXUAL HARASSMENT POLICY

UAB has argued that because it had in place at the time of the events giving rise to this action an anti-sexual harassment policy, it is insulated from Title VII liability.[41] While a policy may be relevant to the issue of notice in measuring the adequacy of a response to sexual harassment, such a policy, whether good or bad, without more does not preclude liability.   Under post-*Ellerth/Faragher* it is possible for an employer who has allowed a supervisor to harass a female employee although without a tangible employment action to avoid liability by proving that it exercised reasonable care to prevent or correct any sexually harassing behavior and that the employee suffering harassment unreasonably failed to take advantage of the corrective opportunities. This is true whether the harassment takes the form of the traditional *quid pro quo* harassing behavior (*Ellerth*) or where supervisors create a severe or pervasive sexually hostile working environment. (*Faragher*).   When, as here, the harassment comes not at the hands of a supervisor but a co-employee, the test is that set out in *Henson, supra*.   With or without an anti-sexual harassment policy, an organization/employer must, upon notice, take reasonable remedial steps to abate the misconduct of a co-employee.   If no reasonable action is taken in such a case, the mere fact that an employer had an anti-sexual harassment policy does not affect the organization's ultimate liability under Title VII.

_____

[41]    In *Farley v. American Cast Iron Pipe Company*, 115 F.3d 1548, 1549, 1552 (11th Cir. 1997) the Eleventh Circuit Court of Appeals stated that "... we are persuaded that ACIPCO had a valid, effective and well disseminated policy prohibiting sexual harassment ... and that within the specific facts in this case, the existence of this policy precludes a finding of constructive knowledge...."   The observation was made in the context of notice or constructive knowledge. *Farley* does not exclusively stand for the proposition that a policy , even one which is effective and well disseminated, precludes liability.   In *Farley* the court found "equally critical" that the company took the complaint seriously and initiated an investigation in conformity with the policy. Moreover, after *Faragher/Ellerth* the touchstone of Title VII jurisprudence is notice.   A policy is evidence relevant to both the method for reporting and reasonableness of a response.

Ms. Ashurst contends that the text of the policy imposes upon the charge therapist of the respiratory therapy department a duty to correct or report sexual harassment. Certainly the text of the policy instructs an employee to report sexual harassment to his or her "supervisor(s) or the Department of Human Resources." However, it is axiomatic that the obligation to report is contingent upon the supervisor's receipt of adequate notice that the complaint is in fact one of sexual harassment. The charge therapists are clearly not supervisors for the purposes of imposing *Faragher* or *Ellerth* liability. The charge therapists are not supervisors under either the *Henson* or *Thompson* test. In *Coates* the Eleventh Circuit ratified the requirement that for the plaintiff to establish notice, the supervisor to whom the complaint is made must have the remedial authority to remedy the alleged misconduct.

UAB's sexual harassment policy holds all employees responsible for offensive language in the work place under the general rubric of sexual harassment. Nothing in the UAB anti-sexual harassment policy suggests that the policy is implemented or animated only when the conduct alleged rises to the level of that which would be actionable under Title VII. Indeed the prophylactic purpose of an anti-sexual harassment policy is advanced by an institutional response to conduct which does not in and of itself rise to the level of Title VII liability. Accordingly, UAB's conclusion that the conduct of Don Redman violated its sexual harassment policy does not suggest that Ms. Ashurst was the victim of a severe or pervasive sexually hostile work environment. UAB's decision to reprimand Suzy Burke for failing to report the obnoxious behavior of Redman and the socially permissive atmosphere of the break room does not indicate that the conduct of Redman or the other respiratory therapist created a sexually hostile work environment as measured by *Henson* or in *Mendoza*.

54

RETALIATION

Ms. Ashurst avers that she was subjected to retaliation by both the University of Alabama at Birmingham and her co-employees following her June 30, 1995 complaint of sexual harassment.  The law is well established that when a plaintiff relies on circumstantial evidence to support a claim of retaliation, she must first establish a *prima facie* case.  *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  Plaintiff's ultimate burden is to show that engaging in a protected activity was the "but for" cause of the alleged adverse employment decision.  *Alford v. City of Montgomery,* 879 F. Supp. 1143, 1152 (M.D. Ala. 1995).  Initially, Ms. Ashurst contends that she was retaliated against by Suzy Burke when Burke informed the night shift of Ms. Ashurst's complaints.  The UAB anti-sexual harassment policy provides for confidentiality of sexual harassment complaints.  In the context of the specific complaint to Burke, however, it is obvious Ms. Ashurst accused Ms. Burke of engaging in sexually explicit conversations with the other therapists.  Ms. Burke's response to the complaint was not inconsistent with the policy nor does her conduct support a claim of retaliation.  Immediately upon receiving Ms. Ashurst's complaint, Burke notified all other employees of the night shift that their conduct had been offensive to Ms. Ashurst.  Burke further told the employees that they were to refrain from such conduct in Ms. Ashurst's presence.  Burke did what her authority permitted.  She told others that they should stop making vulgar comments.  Ms. Ashurst contends that as a result of Burke's disclosure of her complaint, her co-employees stopped talking when she entered the break room or otherwise declined to associate with her.  There is no evidence that any supervisor, including Suzy Burke initiated a plan to punish Ms. Ashurst for her complaint.  To the contrary it would appear that the employees of the night shift, following Burke's instructions, only stopped the sexual banter when Ms. Ashurst was present.

As a by-product of Bonasera's investigation, Regenia Harris wrote Ms. Ashurst on August 21, 1995 concerning her use of profanity and inappropriate conversation in the work place. The memorandum was described as "caution" and referred Ms. Ashurst to the "You and UAB Handbook" which contained the prohibition of the use of profanity in the work place. (Document #27, Exhibit E-2). On August 30, 1995 Ms. Ashurst wrote Ms. Bonasera to complain that she considered Regenia Harris's memorandum to "constitute retaliation as a result of my complaint." (Document #37). Ms. Bonasera immediately telephoned Ms. Ashurst to assure her that Ms. Harris's memorandum was a result of Bonasera's investigation. Bonasera reminded Ms. Ashurst that Ms. Ashurst had admitted the use of profanity in the work place during their meetings. Importantly, Ms. Bonasera also "... advised Ms. Ashurst that if she observed further inappropriate behavior by Mr. Redman or experienced differential treatment in assignments by her supervisor to let [Bonasera] know because that would be considered retaliation." (*Id.*). At the time Ms. Harris wrote to Ms. Ashurst concerning her use of inappropriate language, she had received the report of Bonasera including the interviews with co-workers. In addition to Ms. Ashurst's own admission of the use of inappropriate language, Ms. Harris had information from Laura Arendall that "Dee was telling the nurses that Suzy and Don had something sexual going on" [and that] "Dee continued to say outlandish things about them." (Document #37, Attachment, UAB-00386). Rebecca Dye, a charge therapist, had told Ms. Bonasera that "Dee frequently uses profanity in the work place." (*Id.*, UAB-00372). Ms. Bonasera had reported to Connie Pruitt that "several of the employees I spoke to stated that Dee also uses offensive language. They explained that they haven't heard her make any sexual remarks, however, she frequently uses profanity in the work place...." (*Id.*, UAB-00364). Pruitt, in turn, recommended to Harris on August 7, 1995 "counseling for Ms. Ashurst for spreading rumors and inappropriate language." Apparently rather than impose counseling as a remedial measure Ms.

Harris wrote Ms. Ashurst the cautionary memorandum which plaintiff understood to be "retaliation." In order to establish a *prima facie* case of retaliation Ms. Ashurst must show that she engaged in a protective activity and was subsequently subjected to an adverse employment action. It is critical that she demonstrate a causal link between the protected activity and the adverse employment action. *Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1074 (11th Cir. 1995). There is no question that Ms. Ashurst was engaged in a statutorily protected activity. A temporal connection between the protected activity and an adverse action can sometimes produce a weak inference of retaliation; however, standing alone, the temporal connection is insufficient to create a jury question. *See e.g. Gleason v. Mesirow Financial*, 118 F.3d 1134, 1147 (7th Cir. 1997); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997); *Robinson v. AFA Services Corp.,* 870 F. Supp. 1077, 1084 (N.D. Ga. 1994). Here, the temporal proximity itself fails to establish even an inference of retaliation. There is no question that UAB's anti-sexual harassment policy *inter alia* prohibited the use of profanity in the work place. There is also no question that co-employees of Ms. Ashurst complained of her use of such language while being interviewed by Ms. Bonasera with regard to Ms. Ashurst's allegations. The temporal relationship is a consequence of the investigation of Ms. Ashurst's complaint, not a product of an attempt to retaliate against her for making the initial complaint.

Ms. Ashurst contends that she suffered an adverse employment action when she was "not selected" for the position of charge therapist. Ms. Ashurst contends that she "learned on October 6, 1995 ..." that she had not been selected "... despite [her] qualifications." (Exhibit D-2, Document #27, Ms. Ashurst's October 17, 1995 EEOC complaint). While Ms. Ashurst disputes that Ms. Arant had spoken to her in September concerning the orientation for the charge therapist assignment, she does not dispute that she met with Ms. Arant in November. Ms. Arant's November

2 letter to Ms. Ashurst clearly indicated that positions for charge therapist remained available. Ms. Ashurst does not dispute that she began the orientation process nor that she failed to complete it. She also does not dispute Ms. Arant's initial concern that an orientation for Ms. Ashurst would be more extensive than that for Tamara Dozier because Ms. Ashurst had less experience in the respiratory therapist services provided at particular medical units. (Document #27, Exhibit H, Arant's deposition, Attachment).[43] Ms. Ashurst has not presented evidence which would permit a jury to reasonably conclude that "but for" her engaging in a protected activity she was denied an opportunity to become a charge therapist. The undisputed evidence appears to be that September of 1995 UAB needed to add additional charge therapist to the RT unit. In September of 1995, Tamara Dozier began the orientation process followed by David Smith. At the time of Ms. Ashurst's EEOC complaint that she had been "not selected," charge therapist orientation positions were still open. Ms. Ashurst has offered no evidence that any one ever told her she had been "not selected." When Ms. Ashurst was contacted by Arant, Arant scheduled her for orientation which Ms. Ashurst did not complete.[44] A thorough review of the record establishes that there is no evidence upon which a jury could reasonably find that "but for" Ms. Ashurst's allegations of sexual harassment she would not have received an adverse employment action. Indeed, it is difficult to classify either her claim that the cautionary memorandum or the charge therapist orientation process was in fact an adverse employment action. There is no evidence that the institution initiated or

---

[43]     "[Ms. Ashurst] was advised that she will need to learn about the hemodyramic monitoring performed at MICU and BNT. As charge therapist she may have to assist or if the line therapist calls she may have to perform those tasks on that shift in a situation of not having another to do that duty. She works in CICU so has some experience with infant ventilation .... I will schedule her to orient to charge therapist (1st) with Daisy. She is aware that some employees are constant complainers and to use diplomacy to deal with this...." (*Id.*)

[44]     Evidence in the record suggests that Ms. Ashurst in fact completed the orientation after she returned from her honeymoon at a later time and presently occupies the position of charge therapist with the institution. This fact is immaterial to an assessment of Ms. Ashurst's retaliation claim.

tolerated harassment of Ms. Ashurst after her complaint. *See e.g. Mills v. Wex-Tex Industries*, 991 F. Supp. 1370 (M.D. Ala. 1997)(Plaintiff was "shunned" by her co-worker at the direction of or with the express approval her plant manager.).

After consideration of the entire record the court finds that although Ms. Ashurst was exposed to boorish, vulgar and immature behavior which was unquestionably tinged with sexual connotation and explicit sexual conduct the atmosphere did not create a sexually hostile work environment under controlling Eleventh Circuit authority. This is true both because the individual incidents involving Ms. Ashurst and the principal perpetrator, Donald Redman, were neither so severe or pervasive as to create such an environment. It is also true because the other sexually offensive discussions were initiated by or continued by both male and female employees. Both male and female employees found this boorish behavior to be offensive rendering it difficult to characterize the conduct as "sexual harassment" that is more demeaning to one sex than another. Once the University of Alabama at Birmingham was made aware of Ms. Ashurst's allegations, prompt and reasonable remedial actions were taken which, among other things, appear to have stopped the conduct which had precipitated the complaint. There is no triable issue as to whether the institution retaliated against Ms. Ashurst for making the complaint in the first instance. There evidence that although the conduct described violated the University's policy for work place decorum and sexual harassment, the conduct described does not rise to a level which would warrant Title VII liability to be imposed upon the institution. Judgment, as a matter of law, will be entered on Ms. Ashurst's Title VII claims.

TITLE IX CLAIMS

In her complaint Ms. Ashurst asserted as a separate cause of action "...a claim to redress unlawful discrimination on the basis of sex in violation of Title IX, 20 U.S.C. § § 1681 *et*

59

*seq.* ..." (Document #1, p.9, claim 4).  Ms. Ashurst contended that the defendant's conduct described generally within the complaint violated her right to be free from sex discrimination in connection with an education program receiving or benefitting form federal financial support. Ms. Ashurst also made a claim under Title IX for damages and injunctive relief based upon allegations of unlawful retaliation in response to her opposition to unlawful sex discrimination. (*Id.*, claim 5, p.10).  The Eleventh Circuit has stated *in dicta* that Title VII jurisprudence is not generally applicable to Title IX and has repeatedly held that Title IX more closely resembles Title VI as both were enacted to pursuant to Congress's spending power rather than the commerce power that forms the basis for Title VII.  *See Floyd v. Waiters*, 133 F.3d 786, 789-90 n.5 (11ᵗʰ Cir. 1998) (*citing Franklin v. Gwinnette County Public Schools*, 911 F.2d 617, 622 (11ᵗʰ Cir. 1990)).  The Eleventh Circuit has not addressed whether Title VII provides the exclusive remedy for employment discrimination in federally funded educational institutions.  *See Blalock v. Dale County Board of Education*, ___ F. Supp.2d ___ (M.D. Ala. 1999), 1999 W.L. 1426098.  District courts within the Eleventh Circuit together with the Seventh Circuit have accepted the Fifth Circuit holding in *Lakosky v. James*, 66 F.3d 751 (5ᵗʰ Cir. 1995) as persuasive authority for the proposition that Title VII preempts an independent cause of action under both Title IX and 42 U.S.C. § 1983. (*Id.*, *citing Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7ᵗʰ Cir. 1996); *Gibson v. Hickman*, 2 F. Supp.2d 1498 (M.D. Ala. 1999)).[44]

After consideration of the reasoning of *Lakosky* and the Seventh Circuit's analysis in *Waid* this court, like the *Blalock* court, concludes plaintiff's exclusive remedy for money damages

---

[44] The *Gibson* court found that Title VII preempts employment discrimination for money damages brought under Title IX in part because to permit a Title IX action would "eviscerate Title VII's technical and administrative requirements ..." In the present case there is no question that Ms. Ashurst met the jurisdictional pre-requisites of Title VII.

for her employment-related discrimination claims lies under Title VII.  Ms. Ashurst like the plaintiff in *Blalock* also asserts however that her retaliation claim survives Title VII preclusion.  Ms. Ashurst contends that she was denied a "promotion" to charge therapist and received an unwarranted disciplinary action in retaliation for her opposition to unlawful sexual discrimination.  As noted in the *Blalock* court, following *Lakosky* the Fifth Circuit decided *Lowery v. Texas A&M University System*, 117 F.3d 242 (5th Cir. 1997) in which the plaintiff complained that she was denied a promotion with respect to her involvement in a Title IX investigation based upon the "misallocation of resources among male and female athletes." *Blalock*, ___ F. Supp. ___, 1999 W.L. 1426098, p.5, *citing Lowery* at p. 244, 247.  In *Lowery*, because the plaintiff argued that the retaliation claim arose exclusively under the provisions of Title IX and not Title VII, the Title IX claim was not preempted. In the present case, however, it is apparent that Ms. Ashurst's Title IX claim of retaliation is bottomed upon her Title VII assertions of sexual discrimination rather than the allocation of resources within the educational institution.  As did the *Blalock* court this court finds that Ms. Ashurst's retaliation claim upon which she seeks monetary and equitable relief is brought under the anti-retaliation provisions of Title VII and thus Title VII is plaintiff's exclusive remedy.  Moreover, for the reasons more fully set forth above in the analysis of Ms. Ashurst's Title VII claims, there is no independent Title IX claim for which there are material issues of fact.  Accordingly, judgment will enter on behalf of the defendant on Ms. Ashurst Title IX claims.

42 U.S.C. § 1983

Unlike Title IX, a § 1983 claim is not necessarily preempted by Title VII.  However, the constitutional requirements of § 1983 impose a burden upon plaintiff greater than that within the context of Title VII. After a review of the plaintiff's claims under the framework of § 1983 the court finds that judgment for the defendant must enter with regard to the § 1983 claims.

A separate order of judgment will enter.

As to the foregoing it is SO ORDERED this the 24th day of March, 2000.

_____
PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE